# VITEK, CORRECTIONAL DIRECTOR, ET AL. *v.* JONES

No. 78–1155.  Argued December 3, 1979—Decided March 25, 1980

482

WHITE, J., announced the Court's judgment and delivered the opinion of the Court with respect to Parts I, II, III, IV-A, and V, in which BRENNAN, MARSHALL, POWELL, and STEVENS, JJ., joined, and an opinion with respect to Part IV-B , in which BRENNAN, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in part, *post*, p. 497. STEWART, J., filed a dissenting opinion, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 500. BLACKMUN, J., filed a dissenting opinion, *post*, p. 501.

*Melvin Kent Kammerlohr,* Assistant Attorney General of Nebraska, argued the cause for appellants. With him on the brief was *Paul L. Douglas,* Attorney General.

*Thomas A. Wurtz,* by appointment of the Court, 441 U. S. 960, argued the cause and filed a brief for appellee.

MR. JUSTICE WHITE delivered the opinion of the Court, except as to Part IV-B.

The question in this case is whether the Due Process Clause of the Fourteenth Amendment entitles a prisoner convicted and incarcerated in the State of Nebraska to certain proce-

dural protections, including notice, an adversary hearing, and provision of counsel, before he is transferred involuntarily to a state mental hospital for treatment of a mental disease or defect.

I

Nebraska Rev. Stat. § 83-176 (2) (1976) authorizes the Director of Correctional Services to designate any available, suitable, and appropriate residence facility or institution as a place of confinement for any state prisoner and to transfer a prisoner from one place of confinement to another. Section 83-180 (1), however, provides that when a designated physician or psychologist finds that a prisoner "suffers from a mental disease or defect" and "cannot be given proper treatment in that facility," the director may transfer him for examination, study, and treatment to another institution within or without the Department of Correctional Services.[1] Any prisoner so transferred to a mental hospital is to be returned to the Department if, prior to the expiration of his sentence, treatment is no longer necessary. Upon expiration of sen-

---

[1] Section 83-180 (1) provides:

"When a physician designated by the Director of Correctional Services finds that a person committed to the department suffers from a physical disease or defect, or when a physician or psychologist designated by the director finds that a person committed to the department suffers from a mental disease or defect, the chief executive officer may order such person to be segregated from other persons in the facility. If the physician or psychologist is of the opinion that the person cannot be given proper treatment in that facility, the director may arrange for his transfer for examination, study, and treatment to any medical-correctional facility, or to another institution in the Department of Public Institutions where proper treatment is available. A person who is so transferred shall remain subject to the jurisdiction and custody of the Department of Correctional Services and shall be returned to the department when, prior to the expiration of his sentence, treatment in such facility is no longer necessary."

tence, if the State desires to retain the prisoner in a mental hospital, civil commitment proceedings must be promptly commenced. § 83–180 (3).[2]

On May 31, 1974, Jones was convicted of robbery and sentenced to a term of three to nine years in state prison. He was transferred to the penitentiary hospital in January 1975. Two days later he was placed in solitary confinement, where he set his mattress on fire, burning himself severely. He was treated in the burn unit of a private hospital. Upon his release and based on findings required by § 83–180 that he was suffering from a mental illness or defect and could not receive proper treatment in the penal complex, he was transferred to the security unit of the Lincoln Regional Center, a state mental hospital under the jurisdiction of the Department of Public Institutions.

Jones then intervened in this case, which was brought by other prisoners against the appropriate state officials (the State) challenging on procedural due process grounds the adequacy of the procedures by which the Nebraska statutes permit transfers from the prison complex to a mental hospital.[3] On August 17, 1976, a three-judge District Court, convened

---

[2] Section 83–180 (3) provides:

"When two psychiatrists designated by the Director of Correctional Services find that a person about to be released or discharged from any facility suffers from a mental disease or defect of such a nature that his release or discharge will endanger the public safety or the safety of the offender, the director shall transfer him to, or if he has already been transferred, permit him to remain in, a psychiatric facility in the Department of Public Institutions and shall promptly commence proceedings applicable to the civil commitment and detention of persons suffering from such disease or defect."

[3] After initially certifying this case as a class action, the District Court decertified the class, but permitted intervention by three individual plaintiffs, including Jones. The District Court subsequently dismissed the claims of all plaintiffs except Jones, who is the sole appellee in this Court.

pursuant to 28 U. S. C. § 2281 (1970 ed.),[4] denied the State's motion for summary judgment and trial ensued. On September 12, 1977, the District Court declared § 83–180 unconstitutional as applied to Jones, holding that transferring Jones to a mental hospital without adequate notice and opportunity for a hearing deprived him of liberty without due process of law contrary to the Fourteenth Amendment and that such transfers must be accompanied by adequate notice, an adversary hearing before an independent decisionmaker, a written statement by the factfinder of the evidence relied on and the reasons for the decision, and the availability of appointed counsel for indigent prisoners. *Miller* v. *Vitek,* 437 F. Supp. 569 (Neb. 1977). Counsel was requested to suggest appropriate relief.

In response to this request, Jones revealed that on May 27, 1977, prior to the District Court's decision, he had been transferred from Lincoln Regional Center to the psychiatric ward of the penal complex but prayed for an injunction against further transfer to Lincoln Regional Center. The State conceded that an injunction should enter if the District Court was firm in its belief that the section was unconstitutional. The District Court then entered its judgment declaring § 83–180 unconstitutional as applied to Jones and permanently enjoining the State from transferring Jones to Lincoln Regional Center without following the procedures prescribed in its judgment.

We noted probable jurisdiction 434 U. S. 1060 (1978). Meanwhile, Jones had been paroled, but only on condition that he accept psychiatric treatment at a Veterans' Administration Hospital. We vacated the judgment of the District Court and remanded the case to that court for consideration

---

[4] The statute authorizing the convening of a three-judge court, 28 U. S. C. § 2281 (1970 ed.), was repealed by Pub. L. 94–381, 90 Stat. 1119, effective for actions commenced after August 12, 1976. Because the instant action was filed on November 12, 1975, the three-judge court was properly convened.

of the question of mootness. *Vitek* v. *Jones,* 436 U. S. 407 (1978). Both the State and Jones at this juncture insisted that the case was not moot. The State represented that because "Jones' history of mental illness indicates a serious threat to his own safety, as well as to that of others . . . there is a very real expectation" that he would again be transferred if the injunction was removed. App. to Juris. Statement 24. Jones insisted that he was receiving treatment for mental illness against his will and that he was continuing to suffer from the stigmatizing consequences of the previous determination that he was mentally ill. On these representations, the District Court found that the case was not moot because Jones "is subject to and is in fact under threat of being transferred to the state mental hospital under § 83–180." *Ibid.* The District Court reinstated its original judgment. We postponed consideration of jurisdiction to a hearing on the merits. 441 U. S. 922 (1979). Meanwhile, Jones had violated his parole, his parole had been revoked, and he had been reincarcerated in the penal complex.

## II

We agree with the parties in this case that a live controversy exists and that the case is not moot. Jones was declared to be mentally ill pursuant to § 83–180 and was transferred to a mental hospital and treated. He was later paroled but only on condition that he accept mental treatment. He violated that parole and has been returned to the penal complex. On our remand to consider mootness, the District Court, relying on Jones' history of mental illness and the State's representation that he represented a serious threat to his own safety as well as to that of others, found that Jones "is in fact under threat of being transferred to the state mental hospital under § 83–180." We see no reason to disagree with the District Court's assessment at that time, and the reality of the controversy between Jones and the State has not been lessened by the cancellation of his parole and his return to the state prison,

where he is protected from further transfer by the outstanding judgment and injunction of the District Court. The State, believing that the case is not moot, wants the injunction removed by the reversal of the District Court's judgment. Jones, on the other hand, insists that the judgment of the District Court be sustained and the protection against transfer to a mental hospital, except in accordance with the specified procedures, be retained.

Against this background, it is not "absolutely clear," absent the injunction, "that the allegedly wrongful behavior could not reasonably be expected to recur." *United States* v. *Phosphate Export Assn.*, 393 U. S. 199, 203 (1968); *County of Los Angeles* v. *Davis*, 440 U. S. 625, 631 (1979); *United States* v. *W. T. Grant Co.*, 345 U. S. 629, 633 (1953).[5] Furthermore, as the matter now stands, the § 83–180 determination that Jones suffered from mental illness has been declared infirm by the District Court. Vacating the District Court's judgment as moot would not only vacate the injunction against transfer but also the declaration that the procedures employed by the State afforded an inadequate basis for declaring Jones to be mentally ill. In the posture of the case, it is not moot.

### III

On the merits, the threshold question in this case is whether the involuntary transfer of a Nebraska state prisoner to a mental hospital implicates a liberty interest that is protected by the Due Process Clause. The District Court held that it did and offered two related reasons for its conclusion. The District Court first identified a liberty interest rooted in

---

[5] Because Jones has not completed serving his sentence, he remains subject to the transfer procedures he challenges, unlike the plaintiff in *Weinstein* v. *Bradford*, 423 U. S. 147 (1975), where a challenge to parole procedures was held to be moot because plaintiff had completed his sentence and there was no longer any likelihood whatsoever that he would again be subjected to the parole procedures he challenged.

§ 83–180 (1), under which a prisoner could reasonably expect that he would not be transferred to a mental hospital without a finding that he was suffering from a mental illness for which he could not secure adequate treatment in the correctional facility. Second, the District Court was convinced that characterizing Jones as a mentally ill patient and transferring him to the Lincoln Regional Center had "some stigmatizing" consequences which, together with the mandatory behavior modification treatment to which Jones would be subject at the Lincoln Center, constituted a major change in the conditions of confinement amounting to a "grievous loss" that should not be imposed without the opportunity for notice and an adequate hearing. We agree with the District Court in both respects.

### A

We have repeatedly held that state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment. There is no "constitutional or inherent right" to parole, *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 7 (1979), but once a State grants a prisoner the conditional liberty properly dependent on the observance of special parole restrictions, due process protections attach to the decision to revoke parole. *Morrissey* v. *Brewer,* 408 U. S. 471 (1972). The same is true of the revocation of probation. *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973). In *Wolff* v. *McDonnell,* 418 U. S. 539 (1974), we held that a state-created right to good-time credits, which could be forfeited only for serious misbehavior, constituted a liberty interest protected by the Due Process Clause. We also noted that the same reasoning could justify extension of due process protections to a decision to impose "solitary" confinement because "[it] represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct." *Id.,* at 571–572, n. 19. Once a State has

granted prisoners a liberty interest, we held that due process protections are necessary "to insure that the state-created right is not arbitrarily abrogated." *Id.*, at 557.

In *Meachum* v. *Fano*, 427 U. S. 215 (1976), and *Montanye* v. *Haymes*, 427 U. S. 236 (1976), we held that the transfer of a prisoner from one prison to another does not infringe a protected liberty interest. But in those cases transfers were discretionary with the prison authorities, and in neither case did the prisoner possess any right or justifiable expectation that he would not be transferred except for misbehavior or upon the occurrence of other specified events. Hence, "the predicate for invoking the protection of the Fourteenth Amendment as construed and applied in *Wolff* v. *McDonnell* [was] totally nonexistent." *Meachum* v. *Fano, supra,* at 226–227.

Following *Meachum* v. *Fano* and *Montanye* v. *Haymes,* we continued to recognize that state statutes may grant prisoners liberty interests that invoke due process protections when prisoners are transferred to solitary confinement for disciplinary or administrative reasons. *Enomoto* v. *Wright,* 434 U. S. 1052 (1978), summarily aff'g 462 F. Supp. 397 (ND Cal. 1976). Similarly, in *Greenholtz* v. *Nebraska Penal Inmates, supra,* we held that state law granted petitioners a sufficient expectancy of parole to entitle them to some measure of constitutional protection with respect to parole decisions.

We think the District Court properly understood and applied these decisions. Section 83–180 (1) provides that if a designated physician finds that a prisoner "suffers from a mental disease or defect" that "cannot be given proper treatment" in prison, the Director of Correctional Services may transfer a prisoner to a mental hospital. The District Court also found that in practice prisoners are transferred to a mental hospital only if it is determined that they suffer from a mental disease or defect that cannot adequately be treated within the penal complex. This "objective expectation, firmly fixed in state law and official Penal Complex practice," that

a prisoner would not be transferred unless he suffered from a mental disease or defect that could not be adequately treated in the prison, gave Jones a liberty interest that entitled him to the benefits of appropriate procedures in connection with determining the conditions that warranted his transfer to a mental hospital. Under our cases, this conclusion of the District Court is unexceptionable.

Appellants maintain that any state-created liberty interest that Jones had was completely satisfied once a physician or psychologist designated by the director made the findings required by § 83–180 (1) and that Jones was not entitled to any procedural protections.[6] But if the State grants a pris-

---

[6] A majority of the Justices rejected an identical position in *Arnett* v. *Kennedy*, 416 U. S. 134, 166–167 (1974) (opinion of POWELL, J., joined by BLACKMUN, J.), 177–178 (opinion of WHITE, J.), 210–211 (opinion of MARSHALL, J., joined by Douglas and BRENNAN, JJ.). As MR. JUSTICE POWELL's opinion observed:

"The plurality opinion evidently reasons that the nature of appellee's interest in continued federal employment is necessarily defined and limited by the statutory procedures for discharge and that the constitutional guarantee of procedural due process accords to appellee no procedural protections against arbitrary or erroneous discharge other than those expressly provided in the statute. The plurality would thus conclude that the statute governing federal employment determines not only the nature of appellee's property interest, but also the extent of the procedural protections to which he may lay claim. It seems to me that this approach is incompatible with the principles laid down in [*Board of Regents* v.] *Roth*[, 408 U. S. 564 (1972)] and [*Perry* v.] *Sindermann*[, 408 U. S. 593 (1972)]. Indeed, it would lead directly to the conclusion that whatever the nature of an individual's statutorily created property interest, deprivation of that interest could be accomplished without notice or a hearing at any time. This view misconceives the origin of the right to procedural due process. That right is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in federal employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards. As our cases have consistently recognized, the adequacy of statutory procedures for deprivation of a statu-

oner a right or expectation that adverse action will not be taken against him except upon the occurrence of specified behavior, "the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed." *Wolff* v. *McDonnell*, 418 U. S., at 558. These minimum requirements being a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action. In *Morrissey, Gagnon,* and *Wolff,* the States had adopted their own procedures for determining whether conditions warranting revocation of parole, probation, or good-time credits had occurred; yet we held that those procedures were constitutionally inadequate. In like manner, Nebraska's reliance on the opinion of a designated physician or psychologist for determining whether the conditions warranting a transfer exist neither removes the prisoner's interest from due process protection nor answers the question of what process is due under the Constitution.

### B

The District Court was also correct in holding that independently of § 83–180 (1), the transfer of a prisoner from a prison to a mental hospital must be accompanied by appropriate procedural protections. The issue is whether after a conviction for robbery, Jones retained a residuum of liberty that would be infringed by a transfer to a mental hospital without complying with minimum requirements of due process.

We have recognized that for the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty," *Humphrey* v. *Cady,* 405 U. S. 504, 509 (1972), and in

---

torily created property interest must be analyzed in constitutional terms. *Goldberg* v. *Kelly,* 397 U. S. 254 (1970); *Bell* v. *Burson,* 402 U. S. 535 (1971); *Board of Regents* v. *Roth, supra; Perry* v. *Sindermann, supra." Id.,* at 166–167.

consequence "requires due process protection." *Addington* v. *Texas,* 441 U. S. 418, 425 (1979); *O'Connor* v. *Donaldson,* 422 U. S. 563, 580 (1975) (BURGER, C. J., concurring). The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital "can engender adverse social consequences to the individual" and that "[w]hether we label this phenomena 'stigma' or choose to call it something else . . . we recognize that it can occur and that it can have a very significant impact on the individual." *Addington* v. *Texas, supra,* at 425–426. See also *Parham* v. *J. R.,* 442 U. S. 584, 600 (1979). Also, "[a]mong the historic liberties" protected by the Due Process Clause is the "right to be free from, and to obtain judicial relief for, unjustified intrusions on personal security." *Ingraham* v. *Wright,* 430 U. S. 651, 673 (1977). Compelled treatment in the form of mandatory behavior modification programs, to which the District Court found Jones was exposed in this case, was a proper factor to be weighed by the District Court. Cf. *Addington* v. *Texas, supra,* at 427.

The District Court, in its findings, was sensitive to these concerns:

> "[T]he fact of greater limitations on freedom of action at the Lincoln Regional Center, the fact that a transfer to the Lincoln Regional Center has some stigmatizing consequences, and the fact that additional mandatory behavior modification systems are used at the Lincoln Regional Center combine to make the transfer a 'major change in the conditions of confinement' amounting to a 'grievous loss' to the inmate." *Miller* v. *Vitek,* 437 F. Supp., at 573.

Were an ordinary citizen to be subjected involuntarily to these consequences, it is undeniable that protected liberty interests would be unconstitutionally infringed absent compliance with the procedures required by the Due Process Clause.

We conclude that a convicted felon also is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital.

Undoubtedly, a valid criminal conviction and prison sentence extinguish a defendant's right to freedom from confinement. *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S., at 7. Such a conviction and sentence sufficiently extinguish a defendant's liberty "to empower the State to confine him in any of its prisons." *Meachum* v. *Fano,* 427 U. S., at 224 (emphasis deleted). It is also true that changes in the conditions of confinement having a substantial adverse impact on the prisoner are not alone sufficient to invoke the protections of the Due Process Clause "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him." *Montanye* v. *Haymes,* 427 U. S., at 242.

Appellants maintain that the transfer of a prisoner to a mental hospital is within the range of confinement justified by imposition of a prison sentence, at least after certification by a qualified person that a prisoner suffers from a mental disease or defect. We cannot agree. None of our decisions holds that conviction for a crime entitles a State not only to confine the convicted person but also to determine that he has a mental illness and to subject him involuntarily to institutional care in a mental hospital. Such consequences visited on the prisoner are qualitatively different from the punishment characteristically suffered by a person convicted of crime. Our cases recognize as much and reflect an understanding that involuntary commitment to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual. *Baxstrom* v. *Herold,* 383 U. S. 107 (1966); *Specht* v. *Patterson,* 386 U. S. 605 (1967); *Humphrey* v. *Cady,* 405 U. S. 504 (1972); *Jackson* v. *Indiana,* 406 U. S. 715, 724–725 (1972). A criminal conviction and sentence of imprisonment extinguish an individ-

ual's right to freedom from confinement for the term of his sentence, but they do not authorize the State to classify him as mentally ill and to subject him to involuntary psychiatric treatment without affording him additional due process protections.

In light of the findings made by the District Court, Jones' involuntary transfer to the Lincoln Regional Center pursuant to § 83–180, for the purpose of psychiatric treatment, implicated a liberty interest protected by the Due Process Clause. Many of the restrictions on the prisoner's freedom of action at the Lincoln Regional Center by themselves might not constitute the deprivation of a liberty interest retained by a prisoner, see *Wolff* v. *McDonnell,* 418 U. S., at 572, n. 19; cf. *Baxter* v. *Palmigiano,* 425 U. S. 308, 323 (1976). But here, the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections.

## IV

The District Court held that to afford sufficient protection to the liberty interest it had identified, the State was required to observe the following minimum procedures before transferring a prisoner to a mental hospital:

"A. Written notice to the prisoner that a transfer to a mental hospital is being considered;

"B. A hearing, sufficiently after the notice to permit the prisoner to prepare, at which disclosure to the prisoner is made of the evidence being relied upon for the transfer and at which an opportunity to be heard in person and to present documentary evidence is given;

"C. An opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except

upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination;

"D. An independent decisionmaker;

"E. A written statement by the factfinder as to the evidence relied on and the reasons for transferring the inmate;

"F. Availability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own; and

"G. Effective and timely notice of all the foregoing rights." 437 F. Supp., at 575.

## A

We think the District Court properly identified and weighed the relevant factors in arriving at its judgment. Concededly the interest of the State in segregating and treating mentally ill patients is strong. The interest of the prisoner in not being arbitrarily classified as mentally ill and subjected to unwelcome treatment is also powerful, however; and as the District Court found, the risk of error in making the determinations required by § 83–180 is substantial enough to warrant appropriate procedural safeguards against error.

We recognize that the inquiry involved in determining whether or not to transfer an inmate to a mental hospital for treatment involves a question that is essentially medical. The question whether an individual is mentally ill and cannot be treated in prison "turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington* v. *Texas*, 441 U. S., at 429. The medical nature of the inquiry, however, does not justify dispensing with due process requirements. It is precisely "[t]he subtleties and nuances of psychiatric diagnoses" that justify the requirement of adversary hearings. *Id.*, at 430.

Because prisoners facing involuntary transfer to a mental hospital are threatened with immediate deprivation of liberty

interests they are currently enjoying and because of the inherent risk of a mistaken transfer, the District Court properly determined that procedures similar to those required by the Court in *Morrissey* v. *Brewer*, 408 U. S. 471 (1972), were appropriate in the circumstances present here.

The notice requirement imposed by the District Court no more than recognizes that notice is essential to afford the prisoner an opportunity to challenge the contemplated action and to understand the nature of what is happening to him. *Wolff* v. *McDonnell, supra,* at 564. Furthermore, in view of the nature of the determinations that must accompany the transfer to a mental hospital, we think each of the elements of the hearing specified by the District Court was appropriate. The interests of the State in avoiding disruption was recognized by limiting in appropriate circumstances the prisoner's right to call witnesses, to confront and cross examine. The District Court also avoided unnecessary intrusion into either medical or correctional judgments by providing that the independent decisionmaker conducting the transfer hearing need not come from outside the prison or hospital administration. 437 F. Supp., at 574.

### B*

The District Court did go beyond the requirements imposed by prior cases by holding that counsel must be made available to inmates facing transfer hearings if they are financially unable to furnish their own. We have not required the automatic appointment of counsel for indigent prisoners facing other deprivations of liberty, *Gagnon* v. *Scarpelli,* 411 U. S., at 790; *Wolff* v. *McDonnell, supra,* at 569–570; but we have recognized that prisoners who are illiterate and uneducated have a greater need for assistance in exercising their rights. *Gagnon* v. *Scarpelli, supra,* at 786–787; *Wolff* v. *McDonnell, supra,* at 570. A prisoner thought to be suffering from a

---

*This part is joined only by MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS.

mental disease or defect requiring involuntary treatment probably has an even greater need for legal assistance, for such a prisoner is more likely to be unable to understand or exercise his rights. In these circumstances, it is appropriate that counsel be provided to indigent prisoners whom the State seeks to treat as mentally ill.

## V

Because MR. JUSTICE POWELL, while believing that Jones was entitled to competent help at the hearing, would not require the State to furnish a licensed attorney to aid him, the judgment below is affirmed as modified to conform with the separate opinion filed by MR. JUSTICE POWELL.

*So ordered.*

MR. JUSTICE POWELL, concurring in part.

I join the opinion of the Court except for Part IV–B. I agree with Part IV–B insofar as the Court holds that qualified and independent assistance must be provided to an inmate who is threatened with involuntary transfer to a state mental hospital. I do not agree, however, that the requirement of independent assistance demands that a licensed attorney be provided.[1]

---

[1] I also agree with the Court's holding that this case is not moot. The question is whether appellee faces a substantial threat that he will again be transferred to a state mental hospital. See *Doran* v. *Salem Inn, Inc.,* 422 U. S. 922, 930–932 (1975); *Steffel* v. *Thompson,* 415 U. S. 452, 458–460 (1974); *Doe* v. *Bolton,* 410 U. S. 179, 188 (1973). He was involuntarily transferred from the prison complex to a mental institution, and thereafter paroled upon condition that he continue to receive psychiatric treatment. When he violated parole, he was returned to prison. The State advises us that appellee's "history of mental illness indicates a serious threat to his own safety, as well as to that of others," and "there is a very real expectation" of transfer if the District Court injunction were removed. App. to Juris. Statement 24. The District Court concluded that appellee is under threat of transfer. In these circumstances it is clear that a live controversy remains in which appellee has a personal stake. See *Seatrain Shipbuilding Corp.* v. *Shell Oil Co.,* 444 U. S. 572, 581–583 (1980).

## I

In *Gagnon* v. *Scarpelli,* 411 U. S. 778 (1973), my opinion for the Court held that counsel is not necessarily required at a probation revocation hearing. In reaching this decision the Court recognized both the effects of providing counsel to each probationer and the likely benefits to be derived from the assistance of counsel. "The introduction of counsel into a revocation proceeding [would] alter significantly the nature of the proceeding," *id.,* at 787, because the hearing would inevitably become more adversary. We noted that probationers would not always need counsel because in most hearings the essential facts are undisputed. In lieu of a *per se* rule we held that the necessity of providing counsel should be determined on a case-by-case basis. In particular, we stressed that factors governing the decision to provide counsel include (i) the existence of factual disputes or issues which are "complex or otherwise difficult to develop or present," and (ii) "whether the probationer appears to be capable of speaking effectively for himself." *Id.,* at 790, 791.

Consideration of these factors, and particularly the capability of the inmate, persuades me that the Court is correct that independent assistance must be provided to an inmate before he may be transferred involuntarily to a mental hospital. The essence of the issue in an involuntary commitment proceeding will be the mental health of the inmate. The resolution of factual disputes will be less important than the ability to understand and analyze expert psychiatric testimony that is often expressed in language relatively incomprehensible to laymen. It is unlikely that an inmate threatened with involuntary transfer to mental hospitals will possess the competence or training to protect adequately his own interest in these state-initiated proceedings. And the circumstances of being imprisoned without normal access to others who may assist him places an additional handicap upon an inmate's ability to represent himself. I therefore agree

that due process requires the provision of assistance to an inmate threatened with involuntary transfer to a mental hospital.

## II

I do not believe, however, that an inmate must always be supplied with a licensed attorney. "[D]ue Process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). See *Mathews* v. *Eldridge,* 424 U. S. 319, 334-335 (1976). Our decisions defining the necessary qualifications for an impartial decisionmaker demonstrate that the requirements of due process turn on the nature of the determination which must be made. "Due Process has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer." *Parham* v. *J. R.,* 442 U. S. 584, 607 (1979). In that case, we held that due process is satisfied when a staff physician determines whether a child may be voluntarily committed to a state mental institution by his parents. That holding was based upon recognition that the issues of civil commitment "are essentially medical in nature," and that "'neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments.'" *Id.,* at 607, 609, quoting *In re Roger S.,* 19 Cal. 3d 921, 942, 569 P. 2d 1286, 1299 (1977) (Clark, J., dissenting). See also *Morrissey* v. *Brewer, supra,* at 489; *Goldberg* v. *Kelly,* 397 U. S. 254, 271 (1970).

In my view, the principle that due process does not always require a law-trained decisionmaker supports the ancillary conclusion that due process may be satisfied by the provision of a qualified and independent adviser who is not a lawyer. As in *Parham* v. *J. R.,* the issue here is essentially medical. Under state law, a prisoner may be transferred only if he "suffers from a mental disease or defect" and "cannot be given proper treatment" in the prison complex. Neb. Rev.

Stat. § 83–180 (1) (1976), The opinion of the Court allows a nonlawyer to act as the impartial decisionmaker in the transfer proceeding. *Ante*, at 496.[2]

The essence of procedural due process is a fair hearing. I do not think that the fairness of an informal hearing designed to determine a medical issue requires participation by lawyers. Due process merely requires that the State provide an inmate with qualified and independent assistance. Such assistance may be provided by a licensed psychiatrist or other mental health professional. Indeed, in view of the nature of the issue involved in the transfer hearing, a person possessing such professional qualifications normally would be preferred. As the Court notes, "[t]he question whether an individual is mentally ill and cannot be treated in prison 'turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists.'" *Ante*, at 495, quoting *Addington* v. *Texas*, 441 U. S. 418, 429 (1979). I would not exclude, however, the possibility that the required assistance may be rendered by competent laymen in some cases. The essential requirements are that the person provided by the State be competent and independent; and that he be free to act solely in the inmate's best interest.

In sum, although the State is free to appoint a licensed attorney to represent an inmate, it is not constitutionally required to do so. Due process will be satisfied so long as an inmate facing involuntary transfer to a mental hospital is provided qualified and independent assistance.

MR. JUSTICE STEWART, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

It seems clear to me that this case is now moot. Accordingly, I would vacate the judgment and remand the case to

---

[2] The District Court specifically held that "a judicial officer is not required, and the decisionmaker need not be from outside the prison or hospital administration." *Miller* v. *Vitek*, 437 F. Supp. 569, 574 (Neb. 1977) (three-judge court).

the District Court with directions to dismiss the complaint. *United States* v. *Munsingwear, Inc.,* 340 U. S. 36.

As the Court points out, this is not a class action, and the appellee is now incarcerated in the Nebraska Penal and Correctional Complex with an anticipated release date in March 1982. See *ante,* at 485–487, and n. 3. In that status, the appellee is simply one of thousands of Nebraska prisoners, with no more standing than any other to attack the constitutionality of Neb. Rev. Stat. § 83–180 (1) (1976) on the sole basis of the mere possibility that someday that statute might be invoked to transfer him to another institution.

Although the appellee was once transferred in accord with § 83–180 (1), there is no demonstrated probability that that will ever happen again. *Weinstein* v. *Bradford,* 423 U. S. 147. And this case is not one that by its nature falls within the ambit of the "capable of repetition, yet evading review" exception to established principles of mootness. See *Southern Pacific Terminal Co.* v. *ICC,* 219 U. S. 498; *Super Tire Engineering Co.* v. *McCorkle,* 416 U. S. 115. If the appellee should again be threatened with transfer under the allegedly infirm statute, there will be ample time to reach the merits of his claim.

" 'To adjudicate a cause which no longer exists is a proceeding which this Court uniformly has declined to entertain.' *Brownlow* v. *Schwartz,* 261 U. S. 216, 217–218." *Oil Workers* v. *Missouri,* 316 U. S. 363, 371.

Mr. Justice Blackmun, dissenting.

I agree with Mr. Justice Stewart that this case is not properly before us. I write separately to express my own reasons for reaching that conclusion.

The claimed harm that gave birth to this lawsuit was the alleged deprivation of liberty attending appellee's transfer to the Lincoln Regional Center. It is clear to me that that asserted injury disappeared, at the latest, when appellee was

granted parole.[1]  Cf. *Preiser* v. *Newkirk*, 422 U. S. 395 (1975).
So did any immediate threat that that injury would be suffered
again.  Appellee has been returned to custody, however, and the

[1] The Court does not appear to share this view.  It states that, even
while at the Veterans' Administration Hospital, appellee Jones "insisted
that he was receiving treatment for mental illness against his will."  *Ante*,
at 486.  It adds that appellee was "paroled, but only on condition that he
accept psychiatric treatment."  *Ibid.*  The Court does not identify the
precise import of these facts, but a fair inference is that they are meant
to suggest that this case—even during the time of appellee's parole—
might properly have been pursued on the theory that the appellee was
continuing to feel the effects of the alleged deprivation of constitutional
rights in receiving in-patient care at the Veterans' Administration Hospital.

I cannot accept this suggestion.  First, its premise appears to be faulty.
The District Court did not find, and it does not appear clearly ·in the
record, that the parole board's offer or appellee's acceptance of parole
was in any way related to his prior transfer to the Lincoln Regional
Center.  Appellee chose to accept conditional parole.  Moreover, at the
time appellee elected to go on parole, he was being housed at the penal
complex, not at the Lincoln Regional Center.  Thus, it is not surprising
that the District Court based its finding of nonmootness solely on its con-
clusion that appellee—notwithstanding his conditioned release—was "under
threat of being transferred to the state mental hospital under § 83–180."
App. to Juris. Statement 24.  Second, the "continuing injury" theory seems
to me to be incorrect as a matter of law.  Appellee did not seek or evince
any interest in seeking release from the Veterans' Administration Hospital,
and a declaration that his initial transfer had been illegal would have
neither justified nor predictably led to appellee's removal from that facility.
In other words, after accepting the conditional grant of parole, appellee
could no longer show, as required by the case-or-controversy requirement,
"that he personally would benefit in a tangible way from the court's inter-
vention."  *Warth* v. *Seldin*, 422 U. S. 490, 508 (1975).

The Court also finds some support for its holding in the fact that
vacating the District Court's order would remove the declaration that the
challenged procedures "afforded an inadequate basis for declaring Jones
to be mentally ill."  *Ante*, at 487.  If the Court, by this statement, means
to imply that appellee's suit is somehow mootness-proof due to the con-
tinuing stigma resulting from the transfer to the mental hospital, I
cannot accept that sweeping proposition.  The Court has never suggested
that the "collateral consequences" doctrine of *Sibron* v. *New York*, 392
U. S. 40 (1968), which saves an action challenging the validity of a con-

parties agree that his reincarceration, coupled with his history of mental problems, has brought the controversy back to life.

Given these facts, the issue is not so much one of mootness as one of ripeness. At most, although I think otherwise, it is a case presenting a "mixed question" of ripeness and mootness, hinging on the possibility that the challenged procedures will be applied again to appellee. This Court has confronted mixed questions of this kind in cases presenting issues "capable of repetition, yet evading review," see, *e. g., Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976), and *Sosna* v. *Iowa,* 419 U. S. 393 (1975), and in cases concerning the cessation of challenged conduct during the pendency of litigation, see, *e. g., Walling* v. *Helmerich & Payne, Inc.,* 323 U. S. 37, 43 (1944). In those contexts, the Court has lowered the ripeness threshold so as to preclude manipulation by the parties or the mere passage of time from frustrating judicial review. MR. JUSTICE STEWART correctly observes, and the Court apparently concedes, however, that the "capable of repetition" doctrine does not apply here. Neither does the liberal rule applied in "voluntary cessation" cases, since the current state of affairs is in no way the product of the appellants' voluntary discontinuation of their challenged conduct.[2] Certainly it is not the result of any effort on the part of the appellants to avoid review by this Court. Thus, since these mixed mootness/ripeness rules are inapplicable, this case presents for me nothing more than a plain, old-fashioned question of ripeness.[3]

---

viction after a prisoner has served his sentence, also saves a challenge to a commitment by a patient who has been released from a mental hospital. Nor does the logic of *Sibron*—focusing on tangible and remediable collateral consequences, such as use of a prior conviction to enhance a sentence for a later crime, or to impeach credibility if one appears as a witness—comfortably extend to the claim of a former mental patient. See *id.,* at 55 (referring to "adverse collateral legal consequences").

[2] The decisions to award and revoke parole were made by the Nebraska Parole Board, not by appellants.

[3] It is not clear whether the Court views this as a "voluntary cessation" case. It nowhere expressly relies on the doctrine and does not explain

The Court's cases lay down no mechanistic test for determining whether a dispute is ripe for adjudication. But past formulations are uniformly more rigorous than the one the Court now applies. The Court has observed that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy," *O'Shea* v. *Littleton,* 414 U. S. 488, 495 (1974), and that "general assertions or inferences" that illegal conduct will recur do not render a case ripe. *Id.,* at 497. "A hypothetical threat is not enough." *Public Workers* v. *Mitchell,* 330 U. S. 75, 90 (1947). There must be "actual present or immediately threatened injury resulting from unlawful governmental action." *Laird* v. *Tatum,* 408 U. S. 1, 15 (1972). See *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973) (requiring "some threatened or actual injury"); *Massachusetts* v. *Mellon,* 262 U. S. 447, 488 (1923) (requiring that the litigant "has sustained or is immediately in danger of sustaining some direct injury"). A "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality" is required. *Golden* v. *Zwickler,* 394 U. S. 103, 108 (1969), quoting *Maryland Casualty Co.* v. *Pacific Coal & Oil Co.,* 312 U. S. 270, 273 (1941).

what factors might justify characterizing appellee's present situation as the result of voluntary cessation of illegal conduct by appellants. On the other hand, each of the three decisions cited by the Court to support its application of a "creampuff" ripeness standard, *County of Los Angeles* v. *Davis,* 440 U. S. 625, 631 (1979); *United States* v. *Phosphate Export Assn.,* 393 U. S. 199, 203 (1968); *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 633 (1953), pivoted on the presence of "voluntary cessation." It is therefore unclear whether the Court deems this a "voluntary cessation" case (without explaining why) or deems the "no reasonable expectation of recurrence" standard—to date a litmus carefully confined by a policy-tailored and principled "voluntary cessation" rule—applicable to an amorphous cluster of facts having nothing to do with parties' artful dodging of well-founded litigation. In either event, the Court's analysis invites the criticism, increasingly voiced, that this Court's decisions on threshold issues "are concealed decisions on the merits of the underlying constitutional claim." Tushnet, The New Law of Standing: A Plea for Abandonment, 62 Cornell L. Rev. 663 (1977).

Applying these principles, I have difficulty in perceiving an existing "case or controversy" here. Since our remand, the state officials have indicated nothing more than that they have a general right to apply their statute, and to apply it to appellee if necessary.[4] They have not expressed a present intent or desire to transfer appellee to a mental facility pursuant to the challenged provisions. Nor have they suggested that they may transfer appellee to the Lincoln Regional Center now on the basis of the diagnosis made five years ago. And they have not suggested that they would subject appellee immediately to a "fresh" psychiatric evaluation if the District Court's injunction were lifted. The appellee has represented that he "does not reside in the psychiatric unit of the Nebraska Penal and Correctional Complex, nor is he receiving or accepting psychiatric treatment." Brief for Appellee 11–12. The brief containing that statement was filed some six months ago and some nine months after the revocation of appellee's parole.

In sum, for all that appears, appellee has been assimilated once again into the general prison population, and appellants, at least at this time, are content to leave him where he is.[5] Given these facts, determining whether prison officials within two years again will seek to send appellee to a mental institu-

---

[4] Appellants, to be sure, have announced their intention to continue to use the challenged procedures. That fact, however, is of small, if any, significance, for it is hardly surprising to hear state officials say that they plan to abide by the State's own laws. See *Public Workers* v. *Mitchell*, 330 U. S. 75, 91 (1947) ("the existence of the law and the regulations" does not alone render a suit ripe). Cf. *Poe* v. *Ullman*, 367 U. S. 497 (1961) (desuetude statute).

[5] I do not go so far as MR. JUSTICE STEWART does when he says that appellee is "simply one of thousands of Nebraska prisoners." *Ante*, at 501. For purposes of the "case or controversy" requirement, appellee differs from his fellow inmates in two relevant respects: he has a recent history of perceived psychiatric problems, and in fact he was previously transferred pursuant to the challenged statutes. Cf. *O'Shea* v. *Littleton*, 414 U. S., at 496 ("Of course, past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury").

tion "takes us into the area of speculation and conjecture." *O'Shea* v. *Littleton,* 414 U. S., at 497. Cf. *Longshoremen* v. *Boyd,* 347 U. S. 222 (1954).

It is for these reasons that I would vacate the judgment of the District Court and remand the case to that court with directions to dismiss the complaint.