**Adrian Lopez GARCIA, Plaintiff, Appellant,**

v.

**Irba Cruz DE BATISTA et al., Defendants, Appellees.**

**No. 80–1205.**

United States Court of Appeals, First Circuit.

Argued Sept. 9, 1980.

Decided Feb. 26, 1981.

---

Carlos V. Garcia Gutierrez, Santurce, P. R., for appellant.

Lorraine Riefkohl de Lopez, Asst. Sol. Gen., Dept. of Justice, San Juan, P. R., with whom Hector A. Colon Cruz, Sol. Gen., San Juan, P. R., was on brief, for appellees.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge and WYZANSKI, Senior District Judge.*

COFFIN, Chief Judge.

The plaintiff, Adrian Lopez Garcia, appeals from the dismissal of this action brought under 42 U.S.C. § 1983 against several employees and officials of the Corrections Administration of the Commonwealth of Puerto Rico. He claims that his recommitment to prison from a "halfway house" without notice or a prior hearing failed to comport with the requirements of procedural due process. Plaintiff's prayer for injunctive relief became moot when he was released on parole. On the surviving damages claim, the district court granted

* Of the District of Massachusetts, sitting by designation.

summary judgment in favor of all defendants and dismissed the complaint, holding that plaintiff had no constitutionally protectible liberty interest in remaining in the halfway house program.

The parties have stipulated to the chronology of events and the basic facts. On July 26, 1977, after several years of confinement in Puerto Rico's prisons, plaintiff was transferred to the Halfway House at Arecibo, operated by the Corrections Administration of the Commonwealth of Puerto Rico. To qualify for the program, he had to meet certain criteria established by regulation, including a "minimum custody" classification, a favorable psychological evaluation and a substantial completion of his minimum sentence. While at the halfway house plaintiff held a job and enjoyed privileges unavailable to him in prison. On December 5, 1977 he was recommitted without prior notice or a hearing to the District Jail of Arecibo, a closed penal institution, upon the recommendation of the "Treatment Board" of the halfway house. The transfer was approved the next day by the Classification, Diagnosis and Treatment Center, a body within the Corrections Administration. The Center also decided not to recommend plaintiff for parole. Plaintiff maintains that he was given no reason for these decisions.

*Prior Proceedings*

▆ We first consider plaintiff's objection to the procedure followed by the district court. The case originally was referred to a United States magistrate to take evidence on plaintiff's request for a preliminary injunction. The magistrate conducted a hearing and several months later, on May 18, 1978, issued "Findings of Fact and Conclusions of Law." He recommended that defendants' motion to dismiss,

filed the day of the hearing, be granted on the ground that plaintiff had failed to allege a protectible liberty interest. Plaintiff objected to the recommendation and the district court referred the case back to the magistrate with directions to consider the objections. After reconsidering his initial report, the magistrate reached the opposite conclusion. On September 15, 1978 he issued a "Report and Recommendation" recommending that the defendants' motion to dismiss be denied and that the parties be allowed to conduct discovery. The second recommendation went unopposed and was approved by Chief Judge Toledo.

On the eve of trial, another judge of the district court entered an opinion and order granting judgment in favor of the defendants and dismissing the complaint on the basis of the magistrate's *initial* "Findings of Fact and Conclusions of Law."[1] We can see no explanation for the court's reliance on the magistrate's initial report. The "Findings of Fact and Conclusions of Law" alluded to by the court were not adopted by Chief Judge Toledo but were referred back to the magistrate for reconsideration. The magistrate's second report, which Chief Judge Toledo did adopt, recommended that the motion be denied, thereby nullifying the initial recommendation. Under these circumstances it was improper for the district court to reach back and breathe new life into the magistrate's defunct first report.[2]

We cannot agree with defendants' fallback argument that despite this procedural irregularity, the record clearly establishes their right to summary judgment on the liberty interest issue. The record support for the decision below is sparse indeed. Defendants failed to submit a single affidavit or other sworn testimony in support of their several motions for summary judgment, even after plaintiff had objected to an earli-

---

1. In its opinion, the district court stated:

    "In view of the ... findings of fact and conclusions of law of the Magistrate, as adopted by Chief Judge Toledo, this court finds that the issue regarding a hearing had already been decided and, consequently, that plaintiff has no right to damages predicated upon the failure to provide such a hearing prior to his transfer."

2. Even if the district court properly could have adopted the magistrate's first recommendation, the court's opinion, which fails to mention plaintiff's opposition to the magistrate's recommendation, falls short of the "de novo determination" required by 28 U.S.C. § 636(b)(1) when a party files objections to a magistrate's report.

er motion on that ground. The unsworn letters attached to defendants' motions plainly do not qualify as affidavits under Rule 56(e). *Ramsay v. Cooper*, 553 F.2d 237, 240 (1st Cir. 1977). The only matter properly before the district court, then, other than the pleadings, was the stipulated facts. These the court was bound to presume true as uncontroverted allegations of the complaint. In this posture, defendants can succeed in upholding the judgment in their favor only if the complaint fails to state a valid claim for relief. We therefore turn to an evaluation of the allegations of the complaint.

*Liberty Interest*

The single issue presented in this appeal is whether plaintiff has adequately alleged a claim that by virtue of his recommitment to prison, he was deprived of a constitutionally cognizable interest in liberty.[3] Our due process analysis begins with narrowing the focus of inquiry by reason of the fact that plaintiff was at all relevant times an inmate under sentence of imprisonment. Plaintiff has not challenged the validity of his conviction here, nor has he contended that incarceration at the jail to which he was returned was beyond the scope of his original sentence. As a result of his unquestioned conviction and sentence, we must assume that plaintiff had been legitimately deprived of his liberty to the extent that his recommitment did not infringe any liberty interest substantively guaranteed by the due process clause itself. Lacking a constitutional source for his claimed liberty interest, plaintiff must look to state law. The question, therefore, is whether the Commonwealth can be said to have created a protectible liberty interest by allowing plaintiff to participate in the halfway house program.

■ The Supreme Court has held in several prison transfer cases that in order to establish a state-created liberty interest against transfer, an inmate must be able to demonstrate some "right or justifiable ex-

pectation" rooted in state law that he would not be transferred except for misbehavior or upon the occurrence of other specified events. *Vitek v. Jones*, 445 U.S. 480, 489, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1980); *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976); *Meachum v. Fano*, 427 U.S. 215, 226–227, 96 S.Ct. 2532, 2539–2540, 49 L.Ed.2d 451 (1976). The surest source of a state-created liberty interest is an explicit grant of right in positive law not to be treated adversely absent certain conditions. Such a right may be created by statute or by prison rules and regulations. *Wright v. Enomoto*, 462 F.Supp. 397, 402 (N.D.Cal.1976), aff'd mem., 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). Alternatively, when the discretion of prison officials is limited but not wholly confined by statute or regulation, the Court has found a "justifiable expectation" or "implicit promise" of conditional liberty when, in practice, prison officials exercise their discretion only within the legally prescribed guidelines. *Vitek v. Jones*, 445 U.S. at 489, 100 S.Ct. at 1261; *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972).

■ Plaintiff relies principally on *Morrissey v. Brewer, supra*, and *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), which extended due process protection to parole and probation. The gist of the claim is that the halfway house program, like parole and probation, is a form of conditional liberty that gives rise to a "justifiable expectation" of continued liberty absent misbehavior. The allegations of the amended complaint are that the halfway house program provides its participants with a broad range of opportunities in employment and education not available to prison inmates and maintains a liberal leave policy. Plaintiff alleges that during his four months in the program he was employed first as a car washer and then as a car salesman and that these jobs permitted him to resume providing for his family.

---

**3.** Defendants have not argued that the process afforded plaintiff, if any, was constitutionally   adequate should due process standards apply.

He also alleges that as a halfway house resident he was able to gain admission with a substantial scholarship to attend a "recognized institution of higher education". The leave system at the halfway house is alleged to have been much more extensive than that at closed institutions, both in the frequency of leaves and the purposes for which leaves were granted.

The amended complaint further alleges that measures such as recommitment from the halfway house to prison "are [not] to be taken absent acts or omissions by an inmate." In support of this assertion, the complaint refers to prison disciplinary regulations promulgated by the Commonwealth Secretary of Justice as well as a permanent injunction entered in *Cruz Hiraldo v. DeJesus Schuck*, No. 74–448 (D.P.R., filed July 8, 1974), which enjoined prison authorities from violating those regulations. The 1975 version of the "Rules and Regulations for Disciplinary Procedure in Penal Institutions" (disciplinary regulations), in effect when plaintiff was returned to prison,[4] applied to inmates at "any institution" under the jurisdiction of the Corrections Administration. The halfway houses are under the statutory jurisdiction of the Corrections Administration. P.R.Laws Ann. tit. 4, § 1201.[5] Indeed, it appears that these regulations fulfill the Corrections Administrator's statutory duty to promulgate regulations governing recommitment of halfway house residents to another institution. P.R.Laws Ann. tit. 4, § 1206.[6]

The "substantive section" of the disciplinary regulations establishes an elaborate schedule of offenses and infractions with corresponding punishments varying with the severity of the misconduct. The regulations cover a wide variety of specific conduct such as use of alcoholic beverages, use of profane language and unauthorized possession of money, as well as "the violation of any special conditions imposed on the client." The regulations expressly provide for the use of transfer to more restrictive custody as a sanction, but reserve that punishment for the most serious offenses. Under the "procedural section" of the regulations, an inmate is entitled to five days advance written notice of the charges against him, the possible sanctions if the charges are proved and the time and place of a hearing. The regulations establish a full panoply of hearing and appeal rights, including the right to representation by counsel in all but the most trivial category of offenses.

Although the disciplinary regulations obviously impose substantial limits on the discretion of prison authorities to recommit halfway house residents to prison, they do not expressly provide that misbehavior is the *only* ground for recommitment. Nevertheless, the complaint alleges that recommitment is not to be undertaken "*absent* acts or omissions" violative of the disciplinary regulations. Constrained as we are at this stage of the proceedings to read the complaint in the light most favorable to the plaintiff, we think this allegation can be taken to mean that, in practice, recommitment does not occur absent a transgression described in the disciplinary regulations.

Allegations similar to these formed the basis of the claim in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). State law permitted transfer to a mental hospital of mentally ill inmates who could not be adequately treated in prison. The district court determined that, in practice, only under such circumstances did prison

---

**4.** The complaint refers only to the 1974 regulations, but we think this reference fairly includes the substantially similar successor regulations issued in 1975 in effect when the transfer took place. Defendants have not claimed any discrepancy between the two versions.

**5.** As confirmation of the plain meaning of the phrase "any institution", we note that the prior version of these regulations, promulgated in March 1974, expressly applied to the halfway houses.

**6.** Section 1206 provides as follows:

"The Administrator shall adopt regulations for the administration of the Houses, including the procedure of transfer from the institution to the Halfway Houses as well as the recommitment of any inmate to another institution and all other aspects related to the rehabilitation programs which are developed through these Houses."

authorities actually transfer mentally ill inmates and concluded that a protectible liberty interest was thereby created. The Supreme Court, after canvassing its earlier decisions, termed this conclusion "unexceptionable":

> "We think the District Court properly understood and applied these decisions. Section 83–180(1) provides that if a designated physician finds that a prisoner 'suffers from a mental disease or defect' that 'cannot be given proper treatment' in prison, the Director of Correctional Services may transfer a prisoner to a mental hospital. The District Court also found that in practice prisoners are transferred to a mental hospital only if it is determined that they suffer from a mental disease or defect that cannot adequately be treated within the penal complex. This 'objective expectation, firmly fixed in state law and official Penal Complex practice,' that a prisoner would not be transferred unless he suffered from a mental disease or defect that could not be adequately treated in the prison, gave Jones a liberty interest that entitled him to the benefits of appropriate procedures in connection with determining the conditions that warranted his transfer to a mental hospital. Under our cases, this conclusion of the District Court is unexceptionable." *Id.* at 489–90, 100 S.Ct. at 1261–62.

Although the allegation of prison practice in this case is brief, we conclude on the authority of *Vitek* that it is minimally sufficient in combination with the disciplinary regulations to allege a justifiable expectation of conditional liberty in participation in the halfway house program. Our decision accords with a number of other appellate and district court decisions that have found a protectible liberty interest in similar community release programs. *See Durso v. Rowe,* 579 F.2d 1365, 1371 (7th Cir. 1978), cert. denied, 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979); *Tracy v. Salamack,* D.C., 440 F.Supp. 930, aff'd in relevant part, 572 F.2d 393 (2d Cir. 1978); *Crafton v. Luttrell,* 378 F.Supp. 521, 534 (M.D.Tenn.1974); *Schumate v. New York,* 373 F.Supp. 1166, 1169–70 (S.D.N.Y.1974); cf. *Winsett v. McGinness,* 617 F.2d 996 (3d Cir. 1980) (en banc) (finding liberty interest in right of access to work release program).[7]

Much of the complaint, and much of plaintiff's brief, is devoted to describing the freedom allowed residents in the halfway houses to engage in the normal activities of life. Plaintiff argues, based upon *Morrissey v. Brewer,* that because this freedom includes the "core values of unqualified liberty", 408 U.S. at 482, 92 S.Ct. at 2600, the severity of loss caused by deprivation of halfway house status is alone sufficient to implicate a liberty interest. We cannot agree that this alleged "grievous loss", admittedly less grievous than the revocation of parole considered in *Morrissey,* gives rise to a protectible liberty interest. *Morrissey* also placed great weight on the conditional nature of parole and the "implicit promise" of continued parole absent a violation of those conditions. *Id. Meachum v. Fano,* decided after *Morrissey,* made clear that "grievous loss" alone does not create a liberty interest against transfer, as long as the transfer is within the bounds of the inmate's sentence of imprisonment and the conditions of confinement do not otherwise violate the Constitution. 427 U.S. at 224, 96 S.Ct. at 2538.[8]

Apart from "grievous loss" analysis, however, the freedoms and procedural protections alleged to accompany halfway house

---

**7.** On several different theories, commentators have suggested that work release status is entitled to due process protection. *See* Duffee, Maher & Lagoy, *Administrative Due Process in Community Preparole Programs,* 113 Crim.L. Bull. 383, 398–99 (1977) (analogizing work release to parole); Note, *Due Process Behind Bars,* 48 Fordham L.Rev. 1066, 1083–84 (1980).

**8.** Notwithstanding our valediction in *Sisbarro v. Warden,* 592 F.2d 1 (1st Cir. 1979) that

*Meachum* "expressly rejected the 'grievous loss' approach to questions of procedural due process in prison transfers", the Supreme Court in *Vitek v. Jones,* 445 U.S. at 488, 100 S.Ct. at 1261, sanctioned the lower court's use of grievous loss analysis to derive a liberty interest against transfer from prison to a mental hospital that exceeded the range of confinement authorized by the inmate's sentence.

status strengthen the claim of a justifiable expectation based on penal practice and prison regulations that recommitment to prison is dependent on misbehavior or the occurrence of other specified events. At least without an authoritative representation or official practice to the contrary, an inmate might reasonably assume that freedom of the magnitude alleged here would not be revoked arbitrarily or for a trivial reason. Similarly, the existence under prison regulations of procedural rights to notice and a hearing before transfer, *see* note 10 *infra*, although not creating a substantive liberty interest themselves, may contribute to the inference arising from penal practice that transfer depends upon the occurrence of some predetermined factual predicate. *See Lombardo v. Meachum,* 548 F.2d 13, 15–16 (1st Cir. 1977).

In opposition to the claim of liberty interest, defendants contend that plaintiff's recommitment was not a disciplinary sanction but a "treatment measure" to which the disciplinary regulations did not apply. After carefully examining the regulations relied upon by defendants,[9] we find their argument unavailing. In the first instance, it remains to be seen what prompted plaintiff's return trip to prison. We have not been informed of the reason, nor, plaintiff asserts, has he. Furthermore, the cited regulations offer no support for the proffered distinction between disciplinary and treatment transfers. Section VIII of the "Rules and Regulations for the Halfway Houses", invoked by both parties, does not speak to substantive standards governing transfers, but simply provides that halfway house residents are entitled to the procedural protections of the disciplinary regulations in "all" transfer cases.[10] The lack of qualification cuts against rather than in favor of defend-ants' argument. Similarly, the disciplinary regulations themselves draw no distinction between treatment and disciplinary transfers. To the contrary, the 1974 version of the regulations consistently describes as "treatment and/or disciplinary measures" the same penalties, including recommitment, described as sanctions in the 1975 regulations. Defendants may, of course, attempt to prove that the distinction they contend for is observed in penal practice, but as yet they have not done so.

Accordingly, we hold that the complaint alleges a protectible liberty interest. The judgment of the district court must therefore be vacated and the case remanded for further proceedings consistent with this opinion.

*So ordered.*

---

9. The parties have provided us with a translated copy of "Rules and Regulations for the Halfway Houses", as well as "Rules and Regulations for Disciplinary Procedure in Penal Institutions". As we were not provided with a translated copy of the regulations of the Classification, Diagnosis and Treatment Center, we have not considered them. 1st Cir.R. 11(g).

10. By the literal terms of these regulations, it would appear that plaintiff was entitled to no-tice and a hearing under Puerto Rican law, quite apart from the constitutional requirements of due process. Although the complaint alleges a pendent claim on this theory, neither party has specifically addressed that claim on appeal, nor did the district court do so in its opinion. We express no view on the pendent claim but leave it for the district court's consideration on remand.