## Richmond

WILLIAM C. SCHMIDT, JR., ETC.

v.

C. HOBSON GODDIN, COMMITTEE, ETC., ET AL.

December 3, 1982.

Record No. 811750.

Present: All the Justices.

*Edward G. Modell* (*Blum & Nash,* on brief), for appellant.

*Patricia M. Schwartzschild* (*T. S. Ellis, III; James W. Tredway, III; Hunton & Williams; Christian, Barton, Epps, Brent & Chappell; C. Hobson Goddin, Committee for William C. Schmidt, Jr.,* on briefs), for appellees.

*Amicus Curiae: Mental Health Association, etc., et al. David O. Stewart [D.C.]* (*Leonard S. Rubenstein [D.C.]; Miller, Cassidy, Lorroca & Lewi [D.C.],* on brief), for appellant.

THOMPSON, J., delivered the opinion of the Court.

In 1953, William Charles Schmidt, Jr. (Schmidt), then age 43, was found to be mentally ill and committed to Westbrook Sanitorium in Richmond.[1] He has remained there ever since.

On March 6, 1981, Christina Schmidt and William Charles Schmidt, III, Schmidt's children, filed a petition pursuant to Code § 37.1-134.1 asking the court to declare their father restored to mental competency. In their petition, they alleged, *inter alia*, that on December 30, 1980, they first learned that Westbrook had technically discharged Schmidt as an "involuntary" patient on October 29, 1974. The certificate of discharge stated that Schmidt

---

[1] On October 27, 1953, the Circuit Court of Henrico County appointed a guardian for the estate of Schmidt, who, by reason of impaired health, was incapable of properly handling and managing his estate. Code § 37-140 (1950, as amended). Two days later, a commission determined Schmidt to be mentally ill and committed him to Westbrook Sanitorium. Schmidt was then transferred to Westbrook. By order dated November 12, 1953, the lower court appointed a committee for Schmidt.

was an "Involuntary Admission" from the City of Richmond and was receiving a "Judical [sic] discharge" over the signature of Dr. John R. Saunders. The family requested that the court find Schmidt competent based on submitted independent psychiatric evaluations, and, upon such a finding, enter an order discharging Schmidt's committee.

On April 3, 1981, the Schmidt children also filed a petition for a writ of habeas corpus pursuant to Code § 37.1-103. This action followed a denial (later rescinded) by Westbrook before trial that anyone had ever made the determinations and findings required under Virginia law to discharge Schmidt as an involuntary patient.

On April 3 and 6, 1981, the trial court heard conflicting testimony concerning Schmidt's competency and his ability to care for himself. Two independent psychiatrists, who had examined and reviewed Schmidt's Westbrook file at the request of his children, testified.

Dr. Howerton opined that Schmidt is not suffering from mental illness, is competent to care for himself and his estate, does not present an imminent danger to himself or others, and does not require hospitalization. He felt Schmidt's major problems focused on his desire to be discharged from Westbrook, but he added that Schmidt requires intensive monitoring, preferably with a doctor to follow his progress.

Dr. Chessen testified that in his opinion Schmidt does not present an imminent danger to himself or others, that he does not now require hospitalization, and that he has the capacity to live in a less restrictive environment. Chessen's current diagnostic impression of Schmidt was "schizophrenia, residual type, chronic, mild." He elaborated that this is a category of schizophrenia which is used when there is no longer any overt psychosis or symptoms, but the subtle signs of illness are still found which may be partly due to the effects of prolonged hospitalization. Dr. Chessen, who had experience in examining hospital records for professional peer review programs, concluded that Schmidt's current condition would not meet either the requisite admission or continued-stay criteria.

Dr. John R. Saunders has been treating Schmidt since 1953. He diagnosed Schmidt as suffering from schizophrenia, paranoid type. Dr. Saunders felt that, despite some recent signs of improvement, Schmidt still exhibits paranoia, delusional ideas, auditory

hallucinations, and "ideas of reference." He testified that Schmidt is not capable of caring for himself or his estate, that he is suffering from a mental illness, and that he poses a danger to himself or others if not hospitalized.

Dr. Merritt Foster, a psychiatrist with staff privileges at Westbrook, testified at the request of the committee. His evaluation of Schmidt was based upon having known and observed him over a period of years and upon frequent consultations with Dr. Saunders and the hospital staff, as well as a review of other medical records on Schmidt. Dr. Foster testified that Schmidt is unable to care for himself or his estate, is suffering from a mental illness, is dangerous to himself and others, and is in need of hospitalization. He found that Schmidt was preoccupied with sexual matters and was capable of acting on his delusions, thereby provoking retaliation from others. Dr. Foster stated that he had examined Schmidt the night before the hearing, but admitted that it was necessary to catch Schmidt "off-guard" before Schmidt expressed any delusions.

Other witnesses testifying for the hospital included a licensed practical nurse and the recreational therapist from Westbrook. The nurse recounted an incident in 1977 when Schmidt exposed himself to her, and another incident in 1980 when he accused her of taking money from him. Although complaining that Schmidt's behavior was sometimes improper, she also stated that she had no fear of harm from Schmidt.

The therapist stated that she had worked with Schmidt from 1974-1979 and that on some occasions his behavior had been inappropriate. She recalled that he was verbally abusive at times, but that she did not believe he posed any danger to her.

Schmidt's son testified that since 1970 he had taken his father out of Westbrook on numerous occasions for brief periods without incident. He indicated that in the last two years his father's condition had improved and his father seems more responsive when he is outside of Westbrook. He testified that the first time he ever saw Schmidt's 1974 certificate of discharge was just prior to the hearing, despite the fact that at the time the certificate was signed he was still a co-committee for his father's estate. Schmidt's son added that he was prepared to assist his father in making the transition to a normal living situation.

On cross-examination, the son admitted that his father was not capable of handling his personal and financial affairs without as-

sistance. He stated that he had no plans for his father if he were to leave Westbrook, and that his sister would assume primary responsibility for Schmidt's care, even though a financial expert would be required to manage the estate which was valued at $700,000 in 1971.

Schmidt's daughter, Christina, testified that she had spoken with psychiatrists in Chicago (where she lives) and the Virgin Islands (where she often visits) as well as staff members at McLean Hospital in Massachusetts about arranging for her father's care after he leaves Westbrook. She introduced a 1981 letter and *curriculum vitae* from a psychiatrist in the Virgin Islands who had agreed to provide whatever treatment Schmidt might need. The daughter testified that she has discussed going to the islands with her father and, consequently, has rented a house there. She indicated her desire to provide whatever assistance Schmidt requires, including arrangements for him to live with her, and stated that she and her father could manage the income from a trust without court supervision.

Schmidt himself testified that if he was released he would be willing to establish a trust to manage his assets. He also indicated that he would undergo an evaluation at McLean Hospital if it would lead to his release from Westbrook and the eventuality of his living in a normal situation. Schmidt recalled being examined by all four psychiatrists but remarked that the extent of his encounters with Dr. Saunders was usually only a morning visit during which Dr. Saunders asked how he was feeling. According to Schmidt, he has never had any lengthy discussions or therapy sessions with Dr. Saunders or any other Westbrook physician. He related how Dr. Foster had awakened him at approximately 11:30 p.m. the night before the hearing, and asked him a series of questions based on Schmidt's alleged activities and conversations while a patient at Westbrook.

The trial court ruled by decree entered July 17, 1981, that Schmidt had not regained his legal competency; that he was discharged as an involuntary patient on October 29, 1974, and remains as a voluntary patient until this time; that he is not illegally detained by Westbrook; and that there was no occasion to remove the committee. Assigning errors to the ruling of the trial court, the Schmidt children contend that Schmidt has regained his legal competency; that the trial court failed to delineate the specifics of his incompetency; that Schmidt was denied due process at the *ore*

*tenus* hearing when he was excluded from the courtroom when a portion of the testimony was being heard; and that the court erred in permitting counsel for Dr. Saunders to cross-examine witnesses.

## I. *Sufficiency of the Evidence.*

The record indicates that the trial court had before it the expert testimony of five mental health specialists as well as the testimony of Schmidt, his children, and members of the staff of the hospital. We faced a similar situation in *Baker* v. *Holland*, 175 Va. 520, 9 S.E.2d 298 (1940), where an incompetent, discharged from a state hospital as "not insane," sought to terminate her committee's authority and reclaim her estate. There, as here, the evidence was highly conflicting, and we said:

> After all, it is a question of fact as to whether an incompetent is capable of managing his property, and a finding by the trial court that a person is or is not so capable, if supported by the evidence, will be affirmed by this court.

175 Va. at 528, 9 S.E.2d at 301.

In the instant case, the court chose to accept the testimony of Drs. Saunders and Foster, together with that of other witnesses for Westbrook. Under our standard of review established in *Baker*, there is ample evidence to substantiate the conclusion, and factual finding that Schmidt had not regained competency and we will not disturb the finding.

## II. *Lack of Specific Findings.*

The Schmidt children argued that the trial court's finding that Schmidt had not regained competency was, in effect, an adjudication of legal incompetency or incapacity as defined in Code §§ 37.1-128.01 and -128.04, respectively, thus mandating additional findings by the court as enunciated in these statutes. As appellees point out in their brief, however, those findings are required only in initial determinations of incompetency or incapacity. Since Code § 37.1-134.1, the statute dealing with restoration of competency, does not require such findings, none are necessary. As we noted in *Harbor Cruises* v. *Commonwealth*, 217 Va. 458, 461, 230 S.E.2d 248, 250 (1976), we are not permitted to add words to a statute or to accomplish the same result by judicial interpretation.

In this case, legal incompetence had been established many years ago, the trial court was not convinced that this condition had changed. The specific findings sought by the children were not called for here, and therefore we hold that the trial court's findings were sufficiently elaborative.

## III. *Habeas Corpus.*

■ Initially, the only matter pending before the court was the petition of the Schmidt children for restoration of Schmidt's competency and discharge of the committee pursuant to Code § 37.1-134.1. An *ore tenus* hearing on the petition was scheduled for April 3, 1981, but on that date the Schmidt children filed a petition for a writ of *habeas corpus* pursuant to Code § 37.1-103 after having been advised on the previous day by counsel for Westbrook that the commitment of Schmidt had always been an involuntary one and that the purported discharge of October 29, 1974, was of no legal effect. Before the hearing commenced, counsel for Westbrook admitted she had misstated her client's position and then reaffirmed that Schmidt was a voluntary patient on and after October 29, 1974. Counsel for the Schmidt children argue, and we agree, that Code § 37.1-67.2 (1982 Cum. Supp.) governs voluntary admission. Under this statutory provision, as amended in 1979, the patient, after he has given 48 hours notice, to the hospital, may leave unless sooner discharged pursuant to Code §§ 37.1-98 or 37.1-99. Thus the issues raised by the petition for a writ of *habeas corpus* are moot.

## IV. *Exclusion of Schmidt from the Courtroom.*

■ The transcript reveals that, following a motion made by counsel for Dr. Saunders, Schmidt was excluded from the courtroom during the testimony of Drs. Saunders and Foster, Ms. Bell, and Ms. Lang. The motion was granted over the objection of the Schmidt children, but was agreed to by the committee.[2]

---

[2] At the close of the Schmidt children's case, Dr. Saunders' counsel moved the court to order Schmidt excluded from the hearing on the grounds that his exposure to Dr. Saunders' testimony could adversely affect their therapeutic relationship. Counsel for the Schmidt children objected to the motion, stating that Schmidt and they had discussed the matter and they all agreed that Schmidt was entitled to hear whatever testimony might be presented and that it would be beneficial to Schmidt to know how to improve his behavior, if that was called for. Over that objection, the court granted the motion and ordered Schmidt excluded from the hearing. Thereafter, Schmidt remained outside the courtroom

Counsel for the Schmidt children argue that this was a denial of due process to Schmidt, citing *Vitek v. Jones*, 445 U.S. 480 (1980), involving the commitment of a prisoner to a mental institution. The court affirmed the observance of minimum procedures in *Vitek*, including:

> [A]n opportunity at the hearing to present testimony of witnesses by the defense and to confront and cross-examine witnesses called by the state, except upon a finding, not arbitrarily made, of good cause for not permitting such presentation, confrontation, or cross-examination.

445 U.S. at 494-95. The Schmidt children also cited *Evans* v. *Paderick*, 443 F.Supp. 583 (E.D.Va. 1977), where a prisoner was being transferred in a civil commitment from a prison to a mental institution. There, the court said:

> Even if Virginia law permitted the commitment procedure employed in the instant case, it is clear that the Federal Constitution would require the presence of the person whose involuntary commitment is sought prior to an order of hospitalization being entered. The most elementary notions of due process require that an individual be permitted to be heard, and to hear the evidence adduced against him, before actions are taken by the state which substantially deprive him of his liberty. Therefore, the Court construes the Virginia involuntary commitment statute to require the presence of the person to be committed at the civil hearing.

443 F.Supp. at 585.

In our opinion, what happened here comports with the "good cause" exception recognized in *Vitek*. We adopt the reasoning in *Coll* v. *Hyland*, 411 F.Supp. 905 (D.N.J. 1976), where a constitutional test was made of the New Jersey civil commitment procedure. There, the argument was made that due process requires the personal presence of a defendant in a criminal matter, and this should carry over to a civil commitment which likewise could involve the liberty interest of the individual involved. In holding the

during the testimony of these four witnesses. Schmidt's committee concurred in the motion, citing the disruptive effect that the testimony may have on Schmidt since he was a patient in the hospital and was in daily contact with the witnesses.

rule's provision for attendance at the public hearing constitutionally satisfactory, the court said:

> Our system of justice is based on the adversary system, but that may not necessarily be the optimum procedure in a competency hearing with its special problems and conflicting aims. A balance of traditional concepts and more informal methods may offer greater promise. [Citations and footnote omitted.]
>
> The plaintiff's objection to the provisions of the rule which permit testimony in the patient's absence in restricted circumstances appears to be ill-founded. In a proceeding designed at least in part to benefit the patient, it would indeed be a paradox to require him to hear testimony which might adversely affect his mental condition.
>
> We are convinced that the plaintiff's contention that he be required to be present during all of the testimony—even if it be a real detriment to his possible recovery—is less enlightened than the flexibility provided by the rule. The rule adequately safeguards due process by providing that his attorney must be present in the few situations where the patient—for his own benefit—should be excluded from the hearing.

411 F.Supp. at 912-13.

Here, the committee and guardian ad litem for Schmidt were present as well as the Schmidt children and their counsel. Under these circumstances, we do not think that the due process rights of Schmidt were violated or that the court abused its discretion in excluding Schmidt during the taking of this testimony.

## V. *Trial Participation of Dr. Saunders.*

The narrative transcript describes what happened:

> Following examination of Dr. Howerton by counsel for petitioners, a request was made by counsel for Dr. Saunders to examine the witness. Counsel for petitioners objected to the appearance of counsel for Dr. Saunders on the grounds that Dr. Saunders was in attendance by virtue of a subpoena served upon him by Mr. Goddin and Dr. Saunders lacked standing to participate as a party. The Court denied this ob-

jection and permitted counsel for Dr. Saunders to participate throughout the hearing.

The final decree of July 17, 1981, describes Dr. Saunders as an intervenor. The only process executed against him was a witness subpoena. The record contains no pleading on his behalf, no petition, and no order of court permitting intervention.

Intervention is governed by our Rule 2:15. The statute for this procedure, Code § 37.1-134.1, only provides for notice to the committee and does not say who are additional parties.

Under these circumstances, we think it was error to permit Dr. Saunders to participate in the trial in person or by counsel, but within the parameters of this hearing, we hold that it was not prejudicial error and we decline to reverse on that ground.

In conclusion, we affirm the decree of the trial court of July 17, 1981, in ruling that Schmidt had not regained his competency and refusing to discharge his committee.[3]

*Affirmed.*

---

[3] In addition to ruling that Schmidt remained incompetent and that his committee should not be discharged, the trial court in its final decree held that it was in Schmidt's best interests that he remain at Westbrook Hospital. The parties do not address the question of the propriety of this additional holding, and we express no opinion upon the question.