## CIRCUIT COURT OF SHENANDOAH COUNTY

Town of New Market

v.

Battlefield Enterprises, Inc., et al.

February 9, 1984

Case No. (Chancery) 2192

By JUDGE HENRY H. WHITING

In this suit the Town seeks an injunction against the maintenance of two large signs concededly erected in violation of its ordinance. A demurrer has been filed claiming the ordinance is unconstitutional as a violation of both the Federal and State Constitution rights of free speech.

I. *Standing of Commercial Advertisers to Assert the Invalidity of a Sign Ordinance because of its Effect upon Non-commercial Advertisers.*

The town questions the defendants' rights to raise the issue, contending that they are commercial advertisers only and if the ordinance is invalid it is only invalid as to non-commercial advertisers. This is a threshold issue to be disposed of first.

Generally only the party affected by a penal or other statute may attack its constitutionality, but if its enforcement would "chill" the First Amendment rights of others a vicarious challenge may be mounted. *See Stanley*

*v. City of Norfolk*, 218 Va. 504, 507 (1977); *Owens* v. *Commonwealth,* 211 Va. 633, 638 (1971). The justification for this "overbreadth" doctrine is that the "possible harm to society from allowing unprotected speech to go unpunished is outweighed by the possibility that protected speech will be muted," but it is said to apply "weakly, if at all, in the commercial context." *Bates* v. *State Bar of Arizona*, 433 U.S. 350, 53 L.Ed.2d 810 (1977). In *Metromedia, Inc.* v. *San Diego*, 453 U.S. 490, 69 L.Ed.2d 800 (1981), Metromedia overcame this challenge because it had a "commercial interest" in the protected non-commercial speech (fn. 11, page 504, 812).

Luray and Battlefield have not shown any similar commercial interest in the non-commercial messages affected by this ordinance. To suggest, as counsel does on page 5 of their May 31, 1983 memorandum, that they "may want to display non-commercial messages" falls far short of *Metromedia's* "usually seek[ing] to convey a commercial message, but their billboards have also been used to convey a broad range of non-commercial political and social messages" (*id.*, at 496, 808). Likewise an assertion that "its sign. . . identifies a tourist attraction that is recognized, promoted and protected by the Commonwealth of Virginia [as having] aspects of non-commercial speech as well as commercial speech" (May 31, 1983, memo, pages 5-6) "arguably. . . announc[ing] a natural resource and attraction which is promoted by the Commonwealth of Virginia" (Citing §§ 10-150.11, *et seq.* and 9-152.1, *et seq.*) seems to be weak support for the claim that advertising these commercial ventures is non-commercial speech, without a citation of some authority in support thereof. The two statutes the advertisers cited deal with *protection* of caves, § 10-150.11, and establishment of a cave commission to deal with caves, whose functions, § 9-152.3, and duties, § 9-152.4, contain no direction to promote commercial hawking of caves except possibly for the function of "advis[ing] on the need for and desirability of a state cave recreation plan." § 9-152.3(I).

Absent some additional authority and argument, I do not believe these defendants could assert these claims in their own right.

Therefore I must decide whether the Supreme Courts of the United States or Virginia would permit a commercial advertiser to vicariously assert the First Amendment

rights of non-commercial speakers and readers allegedly violated in the prohibition of such messages by this ordinance. *Bates, supra* declined to extend the doctrine of "overbreadth" against *commercial* speech restrictions (lawyer advertising) on the ground that each commercial advertiser could and probably would assert his interest if threatened (*id.*, at 381, 834), but the non-commercial advertiser's or reader's First Amendment rights were said to be more "fragile interests" and (impliedly) entitled to the benefit of the "overbreadth" doctrine (*id.*, at 380, 833).[1] Therefore it is concluded that these commercial advertisers have standing to raise other parties' First Amendment rights in non-commercial speech in this instance upon grounds unrelated to them.

### II. *Validity of Ordinance.*

There can be little question since *Metromedia, Inc.* v. *San Diego,* 453 U.S. 490, 69 L.Ed.2d 800 (1981), as to the invalidity of those provisions of an ordinance which permit *on-site* commercial messages but prohibit all but specifically listed *on-site* non-commercial messages. This is primarily because of the impermissible inversion of the higher constitutional protection accorded non-commercial over commercial speech. Here, as in *Metromedia*, "There is a broad exception for on-site commercial advertisements, but there is no similar exception for non-commercial speech" (*id.*, at 513, 818). Paraphrasing *Metromedia*, "Insofar as the [Town] tolerates billboards at all, it cannot choose to limit their content to commercial messages; the Town may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of non-commercial messages" (*ibid.*).

San Diego's ordinance, as construed by the Court, was valid insofar as it regulated commercial speech by limiting it to publicizing "the activities upon the premises" (*id.*, at 512, 818) but invalid "in prohibiting

---

[1] See also Stanley v. City of Norfolk, 218 Va. 504, 507 (1977), and Owens v. Commonwealth, 211 Va. 633, 638 (1971), for an implicit recognition of this principle

an occupant from displaying its own ideas or those of others" (*ibid.*).

Section 20-25 of the New Market ordinance has similarly inverted the higher constitutional protection afforded non-commercial speech by permitting on-premise commercial advertising signs but excluding all but a few on-premise non-commercial signs.

A further reason for the invalidity of San Diego's ordinance was its effort to "distinguish between the relative value of different categories. . . of non-commercial speech" in its various exceptions because it would "allow. . . government control over the search for political truth" (*id.*, at 515, 819). While the exceptions for non-commercial messages differ slightly between the San Diego and New Market ordinances, I perceive no essential differences in this regard.

Therefore §§ 20-25 and 20-26 of the New Market ordinance are found to be invalid as to any occupant's display of non-commercial messages upon his premises as violative of the occupant's constitutional rights of free speech for the reasons assigned in *Metromedia*.

However, this does not end the inquiry because these demurrants do not display non-commercial messages and at least one sign is apparently an off-premise display. Therefore we must resolve:

(1) Whether these off-premise commercial sign advertisers may raise this issue. That has been disposed of in Section I hereof.

(2) If so, can the balance of the ordinance be saved by:

(a) "Limiting its reach to commercial speech" (*Metromedia*, fn. 26, page 521, 823); or

(b) A severance of its unconstitutional provisions.

III. *Construction of the Ordinance to Limit its Application.*

Virginia and California both agree that:

(1) Judges should construe all statutes and ordinances to avoid unconstitutionality, if it can be done fairly and reasonably (*id.*, at 906); *Almond v. Gilmer*, 188 Va. 822 (1949); *Metromedia, Inc. v. San Diego*, 649 P.2d 902, 906 (Cal. 1982).

(2) There are limits to the ability of a court to save a statute through judicial construction; it cannot rewrite the statute for by doing so it would be exercising a legislative and not a judicial function. *Metromedia*, 649 P.2d at 907; *General Accident Fire and Life Assurance Corp., Ltd.* v. *Aetna Casualty and Surety Company*, 208 Va. 467, 474 (1968); *Martinsville* v. *County of Henry*, 204 Va. 757, 761 (1963); *Schmidt* v. *Goddin*, 224 Va. 474, 480 (1982).

If this ordinance could be construed so as to limit its terms to commercial speech and assuming that New Market could satisfy the four-part test enunciated in *Central Hudson Gas & Electric Corp.* v. *Public Service Commission*, 447 U.S. 557, 65 L.Ed.2d 341 (1980), as San Diego did in *Metromedia*, it would probably be held valid as a mere regulation of commercial speech. *Metromedia* at 512, 818; *Suffolk Outdoor Advertising Co.* v. *Hulse*, 439 U.S. 808, 58 L.Ed.2d 101 (1978).

A similar salvage operation was attempted by the California Supreme Court in *Metromedia, Inc.* v. *San Diego*, 649 P.2d 902 (Cal. 1982), after the damaged ordinance was remanded to it by the Supreme Court of the United States. There the city urged a narrow reading of the ordinance so as to confine all references to signs carrying a commercial message. The California Court felt it could not do this for two reasons:

(1) The California Court found that the primary intent of the city was to eliminate "signs which distracted pedestrians and motorists and which blighted the aesthetic character of the city. . . the commercial or non-commercial character of the billboard's message [being] largely irrelevant to these goals" (*id.*, at 906). Similarly New Market's primary intent was to deal with the structure[2]

---

[2] The billboard prohibitions are contained in Chapter 20 of the Town Code dealing with zoning. The purposes of that are to "promot[e] the health, safety or general welfare of the public," as well as to accomplish the objectives of the state law authorizing localities to zone. The Town Council "designed the chapter":

(1) "To provide for adequate light, air, convenience of access, and safety from fire, flood and other dangers." Section 20-1(a).

(2) "To facilitate the creation of a convenient, attractive and harmonious community." Section 20-1(c).

(3) "To protect against. . . danger and congestion in travel and transporta-

and not the message contained thereon except as incidental to on-premise activities but its prohibitions have caught non-commercial advertising in its net.

This Court, as the California Court did, must construe the ordinance in the light of the primary intent to deal with the structure and not the content of the messages advertised thereon.

(2) The definition of the prohibited signs as "outdoor advertising display signs" precluded any such limited construction. While the "term 'advertising' may imply a commercial message, it is not, in ordinary usage, limited to such message. 'Advertising' is simply 'the action of calling something. . . to the attention of the public' (Webster's New International Dictionary, 3d ed. 1961, page 31). We speak of 'political advertising' and even of 'personal advertising,' Thus in common usage a billboard bearing a political or even a personal message would be considered an 'advertising display sign'." (*Id.*, at 907).

Unfortunately, New Market has used practically the same language in describing the prohibited signs: "Billboards and general *advertising* signs are prohibited in all districts," § 20-27 (emphasis added); *"Sign, Outdoor Advertising* - Any sign. . . for outdoor *advertising* purposes. . .*" "Billboard is covered by this definition," Section 20-2 (emphasis added). I see no real distinction between the two ordinances and do not believe the definition of "advertising" can be reasonably limited to commercial advertising.

If this ordinance had expressly limited its definition and exclusion of "billboards and general advertising signs" to "signs which direct attention to a business, commodity, service, entertainment, or attraction sold, offered or existing elsewhere than upon the same lot where such sign is displayed," thereby permitting on- and off-premise signs of a non-commercial nature, it probably would have passed constitutional muster.[3] *Suffolk*

---

tion. . ." Section 20-1(f).

[3] In fairness to the drafters of the New Market ordinance it should be recognized that Metromedia itself noted that its decision "plowed new ground" (id., at 496, 809).

*Outdoor Advertising, supra; Metromedia,* 435 U.S. at 499, 511, 69 L.Ed.2d at 809, 817.

Despite a strong policy to construe the ordinance in a manner so as to make it constitutional, I find that its primary intent and express language preclude any fair construction limiting its provisions to commercial signs.

### IV. *Severance of the Invalid Provisions.*

New Market urges a severance of the invalid provisions and an enforcement of the remainder of the ordinance. The severability clause in the ordinance authorizes this surgery if the patient will survive the operation. The rule is well stated in *Board of Supervisors James City County v. Rowe,* 216 Va. 128, 147 (1975):

> [W]e posit the rules concerning severability. Absent a severability provisions, a legislative act is presumed to be non-severable, and the burden of proving severability is upon the supporter of the legislation. Where a severability provision is included, a legislative act is presumed to be severable, the burden of proving non-severability is on the assailant of the legislation, and the presumption of severability must be overcome by considerations which establish the clear probability that the legislature would not have been satisfied with what remains after elimination of the invalid parts. Whether there is or is not a severability provision, "the determination, in the end, is reached by applying the same test, namely, What was the intent of the lawmakers?" 169 Va. at 571, 194 S.E. at 813. While the presence of a severability provision "provides a rule of construction which may sometimes aid in determining [legislative] intent. . . it is an aid merely; not an inexorable command." *Dorchy v. Kansas,* 264 U.S. 286, 290 (1924).

A number of Virginia cases have applied these rules after declaring portions of ordinances and statutes invalid. While each situation is unique and "color matching"

is of little value, the cases do give some guidance in the application of the rules.

Where the application of the surviving portions of a statute would be in direct violation of the original legislative intent, a court may not enforce that portion. *Shulman Co., Inc.* v. *Sawyer*, 167 Va. 386 (1937) (statute invalidly attempted to exclude Norfolk from general law authorizing procedure by notice of motion in Trial Justice Court, merely striking that portion would permit such a proceeding in Norfolk, a result clearly not desired by the Legislature); *Boyles* v. *City of Roanoke*, 179 Va. 484 (1942) (ordinance providing twelve-month penalty where charter only authorized a six-month penalty held also unenforceable as to a conjunctive provision for a fine -- proof showed that ordinance amended as soon as council discovered its error to provide for a six-month jail sentence, with a minimum of thirty days -- that fact alone showed clear legislative intent that offense not be punished only by fine). If the remaining portion is not sufficiently complete to enforce it will not be severed. *Robinson* v. *Commonwealth*, 217 Va. 684 (1977) (county fence law which lost its proscriptive and penalty provisions because of invalidity could not supply the remaining definition of a fence as a basis for prosecution). A void provision which "permeates the entire legislative scheme" prevents enforcement of the balance. *Miller* v. *Ayres*, 213 Va. 25 (1972) (advances of monies to college students attending sectarian and non-sectarian colleges to be repaid by earning passing grades held not to be the "loans" authorized by the Virginia Constitution; remaining provisions authorizing grants to students in non-sectarian colleges could not be enforced because the "interwoven provisions" indicated a legislative intent to "view the program. . . as an indivisible unit," *id.*, at 286). If the invalid parts "are crucial to the purpose and spirit of [an] ordinance. . . the vital organs of the legislative creature [and] the remaining parts. . . mere appendages, and, when severed wholly without sufficient function," no severance is possible. *James City County* v. *Rowe*, *supra* at 148 (elimination of six provisions of a zoning ordinance, including one for architectural review of all applications, prevented enforcement of balance of the remaining eleven provisions as an ordinance

"we confidently believe [the Board] would not have enacted").

Successful severance occurred in a number of Virginia cases where the remaining provisions were found to be sufficiently complete and within the original legislative intent. *King* v. *Arlington County*, 195 Va. 1084 (1954) (provision for fine for keeping a vicious dog enforced despite invalidity of provision for its destruction); *Public Finance Corp.* v. *Londeree*, 200 Va. 607 (1959) (invalid attempted exclusion of evidence in bankruptcy hearing in state statute held not to vitiate conjunction exclusion in state court proceedings); *City of Portsmouth* v. *Citizens Trust Co.*, 216 Va. 695 (1976) (invalid expanded definition of "engaged in business" held not to prevent a limited definition thereof also contained in the remaining license tax ordinance). The fact that a statute attempted to regulate both interstate and intrastate seating of bus passengers and made no distinction between the two did not prevent the excision of the invalid interstate regulation and the application of the remaining statute to intrastate bus travel. *New* v. *Atlantic Greyhound Corp.*, 186 Va. 726 (1947).

The Supreme Court of California attempted to sever San Diego's invalid provisions on the remand of *Metromedia* by excising the non-commercial prohibitions and enforcing the balance of the ordinance as to commercial speech. That Court decided it could not do this because:

(1) The provisions for amortization and removal of forbidden signs would be difficult to apply since the right of removal would depend upon the message displayed, which changed from time to time from commercial to non-commercial and back again. (649 P.2d at 908.)

(2) The limited time exception for political campaigns would be out of place in an ordinance limited to commercial signs (*ibid.*).

(3) The truncated version limited to commercial signs would probably not serve the purpose of the original ordinance because:

(a) Non-commercial billboard advertising being unrestricted, would offer no assurance of a limitation of the number of billboards, the primary purpose of the original ordinance (*ibid.*).

(b) The police would have to monitor the content

of each message to decide if the sign was subject to the truncated ordinance (*ibid.*).

Both the San Diego and New Market used the same approach of forbidding all signs except those specifically listed, each containing a general authorization for on-premise commercial advertising.

Unlike San Diego, New Market forbids *all* off-premise advertising, commercial or otherwise, and if that provision is valid there would be no need to monitor the content of the off-premise signs.

The *Metromedia* plurality in the United States Supreme Court did not have to decide this issue and carefully limited its holding to the fact situation at hand, one of the most important being the limited off-premise political campaign signs but no others. One dissenter contended (453 U.S. at 564, 69 L.Ed.2d at 850) that the plurality's reservation of ruling as to a total prohibition of signs was a "not too subtle hint" that a total ban would be declared invalid, fn. 20 at 515, 819, and another dissenter opined that the plurality would approve a total ban, fn. 4 at 541, 836. The two concurring Justices contended that the ordinance amounted to a total ban (*id.*, at 522, 824) which might have been sustained if "a sufficiently substantial government interest [was] directly furthered by the total ban, and. . . any more narrowly drawn restriction, i.e., anything less than a total ban, would promote less well the achievement of that goal" (*id.*, at 528, 827). I read those two Justices as indicating that a smaller historic or recreational community, Williamsburg, Virginia, or Yellowstone National Park, might not have difficulty with a total ban but a larger community, already heavily industrialized or commercialized, San Diego or Mount Ephraim, New Jersey, (*id.*, at 534, 831), or a whole state, Maine (*id.*, at 530-531, 829), might not "be able to meet the burden" (*id.*, at 534, 831).

These four views may contribute to "the Court's treatment of the subject [as] a Tower of Babel, from which no definitive principles can be clearly drawn" (*id.*, at 569, 854), nevertheless I must try to do so to decide this case.

While a total restriction on all signs might be suspect, there is little doubt about a restriction against

*all* off-premise commercial signs.[4] Although there might be some question about it, I believe a restriction against all off-premise signs (commercial *and* non-commercial) might also be sustained, certainly by the three dissenters in *Metromedia*, possibly by at least two of the plurality and one or more of the concurring Justices.[5]

I believe the *Metromedia* holding should be limited to its factual situation and that a local government should have the right to prohibit all off-premise signs, assuming a sufficient showing is made justifying this action.

New Market would have none of San Diego's severance problems of: (1) amortization; (2) inappropriate exceptions for off-premise non-commercial advertising; or (3) (a) possible proliferation of non-commercial off-premise signs; and (b) deciding which off-premise messages were commercial or non-commercial.

The clear purpose of this ordinance being traffic safety, community planning and aesthetics, and focusing on elimination[6] and limitation of the size, location and manner of attachment of the structures[7] and not the content of the message, I believe a successful severance can be

---

[4] Except perhaps for either Justice Brennan and Justice Marshall (id., at 536, 833).

[5] Assuming they could be persuaded that New Market was sufficiently small, somewhat unique and "unspoiled."

[6] The prohibition of "billboards and general advertising signs in all districts" contained in a separate section, Section 20-37, demonstrates not only a clear intent but a provision which could be executed independent of the other sections, if invalid.

[7] If necessary Section 20-27 prohibiting all signs can be harmonized with Section 20-26(8) by construing the latter as limiting the size of such freestanding signs as are allowed in the business district, but prohibiting other "billboards and general advertising signs in all [other] districts." Section 20-25 dealing with the residential district signs does limit the size and location. The invalidity of those provisions dealing with the messages on the sign do not diminish the effectiveness of the ordinance in "provid[ing] adequate light," Section 20-1(a), facilitat[ing], [an] attractive community, Section 20-1(c), and protect[ing] against. . . danger. . . in travel and transportation, Section 20-1(f).

made of the invalid portion dealing solely with on-premise signs. I believe the Town Council would have taken the "half a loaf" of the prohibition of off-premise signs if it could not have its "whole loaf" of all those signs *and on*-premise signs with narrow restrictions as to commercial and non-commercial on-premise signs. Paraphrasing *New*, "Legal effect and application can be given to so much of the ordinance as affects off-premise signs and size, location and manner of erection of all signs, and the intention of the council satisfied to that extent" (186 Va. at 743). In short, I believe the Town's primary purpose is still served by permitting non-commercial on-premise signs as well as commercial on-premise signs.

Therefore, I believe the ordinance is valid insofar as it prohibits all off-premise signs, commercial and non-commercial alike.

It should be noted that neither the Town nor the advertisers have stipulated any of the facts. In my opinion the facts pleaded and admitted by the demurrer are not sufficient on their face to show the invalidity of the ordinance, even those portions suspect under *Metromedia*. However, I assume that both parties agree as to the facts, as evidenced by the concessions made by the Town in its memoranda; before a decree is entered the facts should be stipulated and stated on the record.