NOTICE: NOT FOR PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION DOES NOT CREATE
LEGAL PRECEDENT AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE MH 2013-002179

No. 1 CA-MH 13-0058
FILED 05-15-2014

---

Appeal from the Superior Court in Maricopa County
No.   MH 2013-002179
The Honorable Rodrick J. Coffey, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Anne C. Longo, Bruce P. White
*Counsel for Appellee*

Maricopa County Legal Defender's Office, Phoenix
By Anne H. Phillips
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Margaret H. Downie delivered the decision of the Court, in which Presiding Judge Kenton D. Jones and Judge Donn Kessler joined.

---

**D O W N I E**, Judge:

**¶1**        L.W.  appeals a superior court order requiring her to receive involuntary mental health treatment. For the reasons that follow, we affirm.

### FACTS AND PROCEDURAL HISTORY [1]

**¶2**        Police officers stopped L.W., who was driving 100 miles per hour.  L.W. stated she was speeding to get away from mold.  Officers brought L.W. to a hospital, where crisis counselor Randy Call conducted an evaluation.  Call described L.W. as "manically wild all over the place," pacing, and exhibiting "scattered" and "racing" thoughts.  Call testified that "in my 12 years of evaluating patients, I've never seen somebody so manic."  L.W. told Call that she ran several red lights "in an attempt to escape the mold and that she was hoping she could get pulled over by police." When Call suggested mental health treatment, L.W. responded "that she's not crazy, that she doesn't need inpatient treatment, that she used to be on medications . . . but that she tapered herself off her medications because they're poisonous and that she believes in mother earth."

**¶3**        While hospitalized, L.W. was cared for by behavioral health technician Ann Ivey.  Ivey testified that L.W. was manic, would not sleep, had pressured speech, would not follow staff's directions, was "concerned about the air, . . . the water, the foods, saying that we were poisoning her," and was "grabbing the phone out of other patients' hands" and telling the callers "we were holding their loved ones hostage and poisoning them."

---

[1]     We view the facts in the light most favorable to sustaining the superior court's judgment. *In re MH 2008-001188*, 221 Ariz. 177, 179, ¶ 14, 211 P.3d 1161, 1163 (App. 2009).

¶4        L.W. was evaluated by two medical doctors, who submitted affidavits in conjunction with the petition for court-ordered treatment. The physicians' affidavits were also admitted by stipulation at the commitment hearing.  Dr. Wey concluded L.W. was persistently or acutely disabled as a result of a mental disorder, with a probable diagnosis of bipolar disorder, "Most Recent Episode Manic, Severe With Psychosis."  Dr. Wey relied on information from the Psychiatric Recovery Center ("PRC"), which reflected that L.W. "believed there were toxins in the interview room at PRC," refused medications, and made a statement that, "maybe I should've just killed myself."  L.W. also reportedly stated "that she can drive better than the police who pulled her over and that she has a race car, although she then stated that she did not know that she had a race car."  L.W. was "selectively mute" during Dr. Wey's evaluation. Dr. Hadziahmetovic also evaluated L.W. and listed a probable diagnosis of "psychotic disorder."  Dr. Hadziahmetovic stated that L.W. had received inpatient psychiatric care "at least three times in the past," observed that she had exposed herself and others to serious danger, noted a past history of suicide attempt, and stated that L.W. had bitten the police officer.

¶5        The superior court held a commitment hearing over the course of several days.  Call and Ivey testified about their involvement with L.W.  L.W. also testified and, as the following excerpt reflects, exhibited some of the behaviors previously discussed:

> Q: There's been testimony here --
>
> A: Honorable Judge.
>
> Q: -- that you are not amenable to any type of mental health treatment --
>
> A: Correct.
>
> Q: -- is that true?
>
> A: Correct, yes.
>
> Q: Why?
>
> A: Because they want to poison the crap out of me.
>
> Q: Okay.

A: You know what I can say about it, please ask me. Some rogue attorney said this once, I believed him.

Q: And do you think that you're acting what others would call normal?

A: No.

Q: Why?

A: Well because I'm a genius, I'm just trying to fit in. Every genius is a misfit; you're a misfit; he's a misfit. Look up, I can tell you -- can I tell you who I -- we can look up?

Q: Not right now, [L.W.]

A: Good, perfect.

Q: Okay. You were running away from your home due to mold, correct?

A: Yeah.

Q: Why were you in your car and going to another facility or trying to get pulled over?

A: Well I was actually -- went to the police station, but the police station was closed, so I didn't remember where the police station was. I've been there the other day because I had some thieves steal my wallet, but I couldn't remember where it was, so I called 911. She said is this an emergency, I said, no, I can't find the police station, it's hidden. Where in the heck is it? So she tells me, you know, just give me good directions.

I show up, I said, I need an officer to meet me there. She says fine. I said I'm on my way there and I see an officer, she said sure. Well, you know, I show up, I'm waiting at the police station, waiting for the officer. Why am I doing this? Because I can't even go into my house, this man is an illegal boyfriend of my girlfriend.

L.W. also repeatedly interrupted the proceedings, made profane comments, and asked the judge what he "smell[ed] like."

4

¶6        After petitioner's witnesses and before L.W. testified, L.W.'s attorney requested a continuance in order to present two expert witnesses: an individual who inspected L.W.'s home for mold and a medical doctor. According to counsel, the inspector found "a very large amount of mold" in L.W.'s home, and "this type of mold can cause people to have psychological reactions, such as the one that [L.W.] is having." The court granted a continuance and set a status conference for July 9, 2013 to give counsel time to procure the witnesses.

¶7        At the July 9 status conference, L.W.'s counsel stated that he was prepared to disclose Dr. Rapp, an expert "in allergy, pediatrics and environmental medicine," and Russell Olinsky, who would testify about mold in L.W.'s home. The following exchange occurred between the court and L.W.'s counsel:

> [Court]: . . . [T]he concern I have is whether your experts are going to be able to connect the dots. As I understand it, you've got Mr. Olinsky, who you said will opine about the level of mold in [L.W.'s] home, and you've got Dr. Rapp, who can say that people who are sensitive to mold may have certain behaviors if they're exposed to it, but I – what I don't hear is that you've got somebody who's going to say that . . . [L.W.] has this sensitivity or that her behavior is a result of the mold, which really, I think, is the missing link.
>
> [Counsel]: Your Honor, that is a fair assessment.
>
> . . . .
>
> [Court]: I guess without that . . . dot being connected, you know, to have someone say that [L.W.] is one who . . . has that sensitivity and that her behaviors are a result of the mold, I don't really think that there's going to be sufficient evidence to rebut what's been presented at this point, and I would be inclined to go forward on just what's been presented under those circumstances.

¶8        In ruling that the proffered testimony was irrelevant and unhelpful, the court stated, in pertinent part:

> [T]he Patient did not identify any experts to testify that she is susceptible to mold or that the mold in her home was causing any of her behaviors. Testimony about the levels of mold in the Patient's home and that some people have

reactions to mold without expert testimony that mold was actually causing the Patient's behaviors is insufficient and for that reason, such expert testimony is not relevant and would not assist the trier of fact in this case.

**¶9**　　　At the continued hearing on July 10, 2013, the court found by clear and convincing evidence that, as a result of a mental disorder, L.W. was "persistently or acutely disabled, and in need of psychiatric treatment." The court ordered L.W. to participate in combined inpatient and outpatient treatment.

**¶10**　　　L.W. timely appealed. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") section 12-2101(A)(10)(a).

## DISCUSSION

**¶11**　　　L.W. contends the superior court violated her due process rights by precluding her proffered expert testimony and improperly shifted the burden of proof. We conclude otherwise.

**¶12**　　　Court-ordered involuntary mental health treatment implicates due process rights under the federal and Arizona constitutions.[2] *See* A.R.S. § 36-539(B)-(C) (listing strict procedural requirements for commitment hearings); *Vitek v. Jones*, 445 U.S. 480, 491-92 (1980) ("[C]ommitment to a mental [health] hospital produces a massive curtailment of liberty, and in consequence requires due process protection.") (internal quotation marks and citation omitted); *In re Pima County Mental Health No. MH 3079-4-11*, 228 Ariz. 341, 342, ¶ 5, 266 P.3d 367, 368 (App. 2011) (Due process protection includes a "full and fair adversarial proceeding."). Due process requires that the patient "be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own." *In re Jesse M.*, 217 Ariz. 74, 76, ¶ 9, 170 P.3d 683, 685 (App. 2007). "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a

---

[2]　　　The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, and Article 2, Section 4, of the Arizona Constitution declare that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

defense . . . ." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "This right is a fundamental element of due process law." *Id.*

¶13        The rules of evidence generally apply to civil commitment proceedings. *In re MH-2008-000867*, 225 Ariz. 178, 181, ¶ 11, 236 P.3d 405, 408 (2010). The superior court has "broad discretion in determining whether to admit expert testimony," and we will not reverse its ruling absent a clear abuse of discretion. *Escamilla v. Cuello*, 230 Ariz. 202, 206, ¶ 20, 282 P.3d 403, 407 (2012). Arizona Rule of Evidence 702 states, in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue . . . .

¶14        Expert testimony that "does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993). The requirement that expert testimony assist the trier of fact "goes primarily to relevance." *Id.* "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ariz. R. Evid. 401.

¶15        The superior court did not abuse its discretion by ruling that the proffered expert testimony was irrelevant and unhelpful because it would not "connect the dots" between the existence of mold in L.W.'s home and her condition. Additionally, substantial evidence, including witness testimony, physician affidavits, and L.W.'s own testimony and behavior, supports the determination that L.W. suffers from a substantial disorder of her emotional processes, thought, cognition, or memory. *See In re MH 2008-001188*, 221 Ariz. 177, 179, ¶ 14, 211 P.3d 1161, 1163 (App. 2009) (appellate court will affirm order for involuntary treatment when supported by substantial evidence). L.W. has a history of mental illness and psychiatric medications. Despite being hospitalized and away from her home for several weeks, L.W. continued to exhibit manic behavior. She refused to eat or take medication, accusing hospital staff of poisoning her, and projecting her own paranoid beliefs onto other patients. The doctors who examined L.W. offered probable diagnoses of bipolar disorder and psychotic disorder.

## CONCLUSION[3]

**¶16**      For the reasons stated, we affirm the superior court's order for involuntary mental health treatment.



Ruth A. Willingham · Clerk of the Court
FILED: gsh

---

[3]     We do not independently address L.W.'s contention that the court improperly shifted the burden of proof by requiring her experts to supply more than "<u>possible</u> causes of the Appellant's mental health condition." As discussed *supra*, the evidence was properly precluded on relevance grounds and because, as proffered, it would not assist the trier of fact.