COURT OF APPEALS
DECISION
DATED AND FILED

November 26, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1949**

STATE OF WISCONSIN

Cir. Ct. No. 2024GN000015

IN COURT OF APPEALS
DISTRICT IV

IN THE MATTER OF THE GUARDIANSHIP AND
PROTECTIVE PLACEMENT OF J.L.L.:

JEFFERSON COUNTY,

PETITIONER-RESPONDENT,

V.

J.L.L.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Jefferson County: ROBERT F. DEHRING, JR., Judge. *Affirmed*.

Before Graham, P.J., Blanchard, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. J.L.L. appeals orders granting petitions for a guardianship of her person and estate and for a protective placement. She argues that the evidence was insufficient to support the orders. We reject J.L.L.'s arguments and affirm.

**BACKGROUND**

¶2 In 2024, Jefferson County petitioned for temporary and permanent guardianship of J.L.L.'s person and estate and for protective placement, including emergency protective placement. The petitions alleged the following. J.L.L. had recently been hospitalized as a result of several significant medical conditions that she was not managing and was placing herself in "imminent danger." Specifically, J.L.L. had a respiratory condition that required treatment with oxygen and she was found in her motel room hypoxic[1] with an "altered mental status." She also had a significant pressure ulcer on her ischium,[2] and an open wound on her left foot, which was exposed to the fat layer. J.L.L. had been living out of a motel room, with limited or no services to assist her with her needs. Her house was unlivable due to mold issues that J.L.L.'s insurance company had been trying to remedy since 2018, but J.L.L. refused to grant access to her house.

¶3 The circuit court ordered a temporary guardianship and an emergency protective placement and appointed Dr. James Freiburger, a licensed

---

[1] "Hypoxia" is "a deficiency of oxygen reaching the tissues of the body." *Hypoxia*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/hypoxia (last visited Nov. 24, 2025).

[2] "Ischium" is "the lower and posterior of the three principal bones composing either half of the pelvis." *Ischium*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/ischium (last visited Nov. 24, 2025).

psychologist, to examine J.L.L. and submit a report to the court. Freiburger and two other witnesses were called to testify by the County at a hearing, and Freiburger's report was entered into evidence. In both his testimony and report, Freiburger concluded that J.L.L. has an impairment in the form of a degenerative brain disorder—specifically, a neurocognitive disorder—that is permanent or likely to be permanent; that she is in need of guardianship of her person and estate; and that she requires protective placement.

¶4 The County also called Sarah Fitch, an occupational therapist who works with J.L.L. in the skilled nursing facility in which J.L.L. resides, and Shelly Theder, the lead adult protective service worker for the County. J.L.L. testified on her own behalf, opposing guardianship and protective placement. J.L.L.'s guardian ad litem informed the circuit court that, consistent with his report, he believed that it was in J.L.L.'s best interest for the court to grant the petition for guardianship of J.L.L. and her estate and to order protective placement.

¶5 The circuit court granted the County's petitions for guardianship and protective placement. J.L.L. appeals.

## DISCUSSION

¶6 J.L.L. argues that the County failed to present sufficient evidence to support the order granting a guardianship of her person and estate or the order for protective placement. Whether the evidence supports a guardianship or a protective placement is a question of law that we review de novo. *See Walworth County v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377. We will not overturn the circuit court's findings of fact unless they are clearly erroneous. *See id.* For the reasons that follow, we conclude that sufficient evidence supports the circuit court orders.

3

I. Guardianship of J.L.L.'s Person and Estate

¶7      The criteria for a guardianship of a person and the person's estate are set forth in WIS. STAT. § 54.10(3)(a) (2023-24).[3]  A court may find a person "incompetent" and appoint a guardian of the person and the person's estate if the court finds all of the following by clear and convincing evidence:

> 1. The individual is aged at least 17 years and 9 months.
>
> 2. For purposes of appointment of a guardian of the person, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety.
>
> 3. For purposes of appointment of a guardian of the estate, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions related to management of his or her property or financial affairs, to the extent that any of the following applies:
>
>> a. The individual has property that will be dissipated in whole or in part.
>>
>> b. The individual is unable to provide for his or her support.
>>
>> c. The individual is unable to prevent financial exploitation.
>
> 4. The individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-making agreement under [WIS. STAT.] ch. 52, or other means that the individual will accept.

---

[3] All references to the Wisconsin Statutes are to the 2023-24 version.

"Impairment," as used in § 54.10(3)(a)2., 3., means "a developmental disability, serious and persistent mental illness, degenerative brain disorder, or other like incapacities." WIS. STAT. § 54.01(14).

A. Guardianship of J.L.L.'s Person

¶8      J.L.L. does not dispute that she suffers from an "impairment" in the form of a degenerative brain disorder under WIS. STAT. §§ 54.10(3)(a)2. and 54.01(14). In challenging the guardianship of her person, J.L.L. argues that the County did not present clear and convincing evidence that, due to her impairment, she is "unable effectively to receive and evaluate information or to make or communicate decisions to such an extent [that she is] unable to meet the essential requirements for … her physical health and safety" under § 54.10(3)(a)2. The phrase "meet the essential requirements for physical health or safety" means "perform those actions necessary to provide the health care, food, shelter, clothes, personal hygiene, and other care without which serious physical injury or illness will likely occur." § 54.01(19). We conclude that, contrary to J.L.L.'s argument, the County established these statutory criteria by clear and convincing evidence, which we summarize below.

¶9      At the time of the hearing, J.L.L. was a 76-year-old resident of a skilled nursing facility. Freiburger conducted an in-person examination of J.L.L. two weeks before the hearing and his report was received into evidence and considered by the circuit court in making its determination. In his report, Freiburger noted that J.L.L. has a degenerative brain disorder—specifically, a neurocognitive disorder—that interferes with her ability to receive and evaluate information, use information in a decision process, communicate decisions, and meet essential requirements of her health and safety. Freiburger's report further

stated that J.L.L. could "not demonstrate adequate verbal understanding, judgment, and insight, evidencing substantial impairments in insight and ability to receive and evaluate information, recall what she has seen, heard, and read, and make informed decisions." The report also stated that, because J.L.L.'s "judgment is significantly distorted[,] she is seen as a safety risk at present if left to her own devices" and that her "[i]mpairments in judgment and insight are demonstrated through testing scores and experiences leading to hospitalization and placement."

¶10 Freiburger supported these conclusions with testimony and statements in the report that included the following. J.L.L. initially told Freiburger that the only condition or problem area she experiences is pain, which, according to Freiburger, was "significant," because she suffers from "conditions and deteriorations," in addition to pain, that "have placed her in substantial danger." Specifically, J.L.L. had a significant pressure ulcer, a wound on her left foot that was exposed to the fat layer, and respiratory concerns requiring oxygen; and she was hospitalized after "being found hypoxic with altered mental status." J.L.L.'s risk of falling was elevated because her ambulation was limited and she demonstrated an unsteady gait. J.L.L. had been living out of a motel room, "refusing help and assist[ance]." Her house was not livable due to black mold issues and, although her insurance company had been attempting to access the house to address the issue since 2018, J.L.L. would not allow insurance company personnel or cleaning services into her house unless she was present and she was "unwilling to make accommodations to be there." Her stated reason for not allowing people into her house was that a relative told her that "people had come into his house and had stolen items and money from him." In addition, J.L.L. had "no service[s] … coming into the motel" to help her, because "they withdrew due to safety concerns." According to Freiburger, J.L.L. was unable to "understand

and problem-solve for her healthcare and finances" and her belief that she could do so was based on her "historical functioning," that is, her ability to do so in the past.

¶11    Freiburger testified that, as a result of J.L.L.'s neurocognitive disorder, she "is unable to make informed decisions regarding her healthcare and finances, and she is unable to adequately provide for her own care and custody and safety." Although J.L.L. "is able to take in information, she's not adequately able to process and apply that information [in order] to make an informed decision." For example, according to J.L.L.'s medical team, J.L.L. has acute and chronic respiratory failure with hypoxia; however, J.L.L. denied having the underlying condition and did not believe that she needed to be treated with oxygen, resulting in her discontinuing her oxygen against medical advice. In addition, Freiburger believed that one of J.L.L.'s wounds was not healing well, which required "staff assists." Nevertheless, J.L.L. indicated that pain was her only condition "and believed that she could return back to her hotel and live there on her own without help and supports" and that she "didn't believe" the information that physicians and medical staff were attempting to convey to her. J.L.L.'s statements were significant to Freiburger as a psychologist because "an individual's inability to even acknowledge their … impairments or conditions, leads to" uninformed decision-making, "because they're not using rational, reality-based information to adequately plan for themselves."

¶12    Freiburger also performed a series of tests to evaluate J.L.L.'s mental status and reasoning abilities. As to J.L.L.'s reasoning, Freiburger checked "moderate" on the form, which according to Freiburger, is "clinically significant." Freiburger also assessed J.L.L.'s executive functioning, which includes the ability to be able to execute financial and physical needs, and to process and complete

7

independent activities of daily living. According to Freiburger, J.L.L.'s executive functioning was "significantly impaired." He based this determination on various factors, including J.L.L.'s inability to care for her wound or address the black mold in her house and her indication to Freiburger that she had been "doing fine" in the motel room with in-home services, even though: the in-home provider refused to continue services due to the "significant incontinence of both bowel and bladder and due to the smell and disrepair of the room"; the in-home provider stated that continuing to provide in-home care presented a safety risk and that adequate help could no longer be provided; and the motel would not allow J.L.L. back due to the condition of the room. Further, although J.L.L. could not return to her house due to the mold issues, she would not allow insurance company personnel or others to enter her home to fix the problem.

¶13 In addition to Freiburger's testimony, the circuit court heard testimony from Fitch, an occupational therapist who had been treating J.L.L. at the skilled nursing facility. Fitch's testimony included the following. J.L.L. posed a moderate fall risk and was able to walk no more than 150 feet using a front-wheeled walker with standby assist. J.L.L. required both a walker and standby assist for her safety and balance, and to manage her oxygen tank tubing. In the context of walking, "standby assistance" means that the person providing assistance is standing by to help if needed, which in J.L.L.'s case was approximately 10 percent of the time, primarily to help with the oxygen equipment. J.L.L. also required standby assist for all toileting transfers, bathing, and hygiene, and J.L.L. was not able to perform those tasks independently. J.L.L. also experienced incontinence, during which she required physical assistance with cleanup because without such assistance, incontinence may be "detrimental to skin integrity" and create the risk of infection. In fact, at the time of the hearing, J.L.L.

had a wound on "her backside." J.L.L.'s incontinence was a "consistent occurrence" and with every episode of incontinence, J.L.L. required physical assistance for cleanup.

¶14 J.L.L. also testified. J.L.L. denied refusing oxygen since going into the hospital, and testified that she has not refused care from the nursing staff regarding the wound on her foot or the ulcer on her ischium. When J.L.L. was asked by her attorney whether she acknowledged the need for some in-home health assistance, J.L.L. was equivocal in her response, responding, "Well, it's an adjustment period when people go through something like that, and I think I was looking for a second or third opinion…." When asked if she would seek home healthcare in the community if she were discharged from her current facility, she responded "absolutely," but she then testified that there was "one home care agency that for some reason refused to treat me, which I think was a liability." She testified that she had taken care of her health and her financial situation for the 20 years since her husband's death and "way before that" and that she found the suggestion that she could not do so "insulting." As to her health situation, J.L.L. testified that she had osteoporosis and high blood pressure and "a lot of different health conditions that [she is] very well aware of," but that she doesn't "walk around crying about [her] health conditions," and instead maintains a strong faith and positive attitude.

¶15 In the course of reviewing the evidence and granting guardianship of J.L.L.'s person, the court credited the testimony of the County's witnesses over J.L.L.'s testimony, saying:

> The [County's] witnesses are professionals in the community, with no direct stake in the outcome, other than trying to do their jobs well. Their testimony is intelligent and reasoned.

> [J.L.L.'s] testimony, and she also comes across as a well-spoken, intelligent lady; however, she does have a stake in the outcome and her testimony in some areas directly contradicts that of the professionals.

We defer to these credibility determinations. *See Therese B.*, 267 Wis. 2d 310, ¶26 (circuit court in guardianship and protective placement cases may weigh the testimony and determine the credibility of witnesses, and this court "must defer to this assessment of the credibility of the experts and the weight of the testimony."). The court then summarized and adopted key points in the County's evidence and rejected J.L.L.'s suggestion that, because she had been able to meet her own needs in the past, she could do so now and going forward.

¶16     The evidence set forth above supports the circuit court's order for guardianship of J.L.L.'s person. Specifically, and contrary to J.L.L.'s contention, the County presented clear and convincing evidence that, at the time of the hearing, due to J.L.L.'s impairment, she was "unable effectively to receive and evaluate information or to make … decisions to such an extent [that she was] unable to meet the essential requirements for … her physical health and safety" and, specifically, that she was unable to "perform those actions necessary to provide the health care, … shelter, … personal hygiene, and other care without which serious physical injury or illness will likely occur." WIS. STAT. §§ 54.10(3)(a)2., 54.01(19). J.L.L.'s arguments to the contrary are not persuasive.

¶17     In challenging the circuit court's determination, J.L.L. emphasizes the statutory language requiring the County to prove that "serious physical injury or illness will likely occur," WIS. STAT. § 54.01(19), and suggests that the County failed to satisfy this standard. She further notes that, pursuant to WIS. STAT. § 54.10(3)(b), a guardianship "may not be based on mere old age, eccentricity, poor judgment, [or] physical disability" (subject to an exception not applicable

here), and suggests that the guardianship order was based solely on these considerations. J.L.L. asserts that "at best, the [C]ounty proved that [J.L.L.] was 76 years old, that she had exercised some poor judgment about her healthcare, and that she is physically disabled."

¶18     As support for her position, J.L.L. relies on Fitch's testimony that: although J.L.L. poses "a moderate fall risk," Fitch was not aware of any incidents during J.L.L.'s time at the current facility that J.L.L. has fallen while walking; J.L.L. is able to use her arms and hands to address problems with oxygen tubing that arise when she is walking; and the incidents of incontinence at the facility were not "emergency situations" at the time they occurred. J.L.L. also relies on her own testimony acknowledging that she has health conditions and that she has not refused oxygen since being at the current facility, as well as evidence indicating that she is willing to take medications, accept medical interventions, and engage in occupational therapy.

¶19     J.L.L.'s arguments—which focus on her conduct and condition while under guardianship and protective placement in a skilled nursing facility— ignore the evidence of the circumstances that brought her to that point. These arguments also ignore the overwhelming evidence showing that, at the time of the hearing, J.L.L. was unable to "perform those actions necessary to provide the health care, … shelter, … personal hygiene, and other care without which serious physical injury or illness will likely occur." WIS. STAT. § 54.01(19); *see* WIS. STAT. § 54.10(3)(a)2. This evidence includes the unrefuted testimony that J.L.L. informed Freiburger that she believed she was "fine," despite the undisputed evidence showing that while living at the motel she was hypoxic with an altered mental status requiring hospitalization and had a significant ulcer on her ischium, a foot wound exposing the fat layer, and incontinence, none of which she was

adequately addressing; that J.L.L. could not return to her house due to a years-long mold issue which she had not remedied and could not return to the motel because the motel would not allow her return and because in-home help refused further services; and that J.L.L. lacked the ability to independently perform basic hygiene functions like bathing and toileting. The evidence also includes Freiburger's opinions—which were not contradicted by any contrary expert or professional opinion—that J.L.L. was unable to currently understand and address her healthcare and that her belief that she could do so rested too heavily on her ability to do so in the past.

¶20    In sum, based on the record before us, we conclude that clear and convincing evidence supports the circuit court's order granting the County's petition for guardianship of J.L.L.'s person.

B. Guardianship of J.L.L.'s Estate

¶21    J.L.L. also challenges the sufficiency of the evidence with respect to the guardianship of her estate. As previously noted and as pertinent here, to obtain guardianship of a person's estate, the petitioner must prove by clear and convincing evidence that

> because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions related to management of his or her property or financial affairs, to the extent that any of the following applies:
>
> a. The individual has property that will be dissipated in whole or in part.
>
> b. The individual is unable to provide for his or her support.

WIS. STAT. § 54.10(3)(a)3.a., b. We conclude that the evidence which we now summarize supports the circuit court's order for guardianship of J.L.L.'s estate.

¶22 First, Freiburger's testimony and report establish that, due to her impairment, J.L.L. was "unable effectively to receive and evaluate information or to make … decisions related to management of ... her property" to the extent that the property would "be dissipated in whole or in part" WIS. STAT. § 54.10(3)(a)3.a. J.L.L. allowed black mold to persist in her house for approximately six years by refusing to allow her insurance company to fix the issue. According to Freiburger's report, when he asked J.L.L. why it had taken so long for the mold situation to be fixed, J.L.L. said that the insurance company had not given her any estimates yet and had made no efforts to help with the mold, while also telling Freiburger that she "won't let people into [her] house" because "people went into [her brother's] home and stole $30,000 worth of coin." Also, as mentioned, Freiburger's report stated that J.L.L.'s "house is not livable" due to the mold issue and that although "the insurance company has been attempting to access the house to address [the mold] since 2018," J.L.L. "would not let them enter unless she is present and has been unwilling to make accommodations to be there," nor would she allow cleaning services to enter her house without her present. Moreover, in his report, Freiburger noted that J.L.L.'s incapacity interferes with her ability to "address the risk of property being dissipated in whole or in part." The record provides clear and convincing evidence to support the guardianship of J.L.L.'s estate under § 54.10(3)(a)3.a.

¶23 The evidence also shows that guardianship of J.L.L.'s estate was warranted under WIS. STAT. § 54.10(3)(a)3.b.—*i.e.*, because J.L.L. was "unable effectively to receive and evaluate information or to make … decisions related to management of … her financial affairs" to the extent that she was "unable to

provide for … her support." Specifically, Freiburger's report stated that J.L.L.'s incapacity interferes with her ability to "manage … her property and financial affairs" and "provide for … her own support." The report also stated that, based on Independent Living Scales Testing, which evaluates "the degree to which an individual is capable of caring for themselves … and their property," J.L.L. "could not identify her bills" and "require[d] help with health care appointments, finances, orchestrating and managing bills and health insurance, home and health maintenance, daily routine orchestration and management, and problem solving." The report further noted that J.L.L.'s "response to functional and adaptive questions were incomplete when asked what she could do regarding problems with power, water, gas, and lights." Thus, under either subdivision paragraph 3.a. or 3.b., or both, there was clear and convincing evidence to support guardianship of J.LL.'s estate. We are not persuaded by J.L.L.'s arguments to the contrary.

¶24    J.L.L. asserts that "none of the [C]ounty's witnesses provided any proof that [J.L.L.]'s purported incapacity rendered her unable to manage her property or financial affairs." As shown above, the circuit court had a reasonable basis to find to the contrary. J.L.L. also asserts that "[a]t best the evidence shows that [J.L.L.] made decisions about her home that others deemed unwise." She points to her testimony that she owned her home and cared for her finances for 20 years following her husband's death and "way before that"; that she paid off the mortgage on her house, paid medical bills, and cashed out an annuity; and that she "never has a problem" with finances. J.L.L. further suggests that she was justified in not allowing people into her house without her being present in order to protect

herself from theft.[4]  However, as previously noted, Freiburger observed that J.L.L. was "unwilling to make accommodations to be [at her house]" to resolve the mold issue for approximately six years.  He further opined that J.L.L.'s belief that she could currently manage her health care and home rested too heavily on her ability to do so in the past.  And, as also noted, the circuit court credited Freiburger's testimony over J.L.L.'s and J.L.L. does not provide a basis for us conclude that this was clearly erroneous.

¶25    In sum, we conclude that the County presented clear and convincing evidence to support the circuit court order granting guardianship of J.L.L.'s estate.

## II.  Protective Placement

¶26    A protective placement is "'a massive curtailment of liberty.'"  ***State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.***, 122 Wis. 2d 65, 80, 362 N.W.2d 104 (1985) (quoting ***Vitek v. Jones***, 445 U.S. 480, 491-92 (1980); *see also **id.*** at 76-77 ("Protective placements … are the only involuntary commitments under Wisconsin law that are indefinite in duration and thereby are tantamount to a life sentence to a nursing home or other custodial setting.").

---

[4]  To clarify, the circuit court found that J.L.L. would not let people into her house to fix the mold problem, and that this was "due to people having stolen money from her in the past," a finding that J.L.L. relies on in support of her argument that the evidence was insufficient to support guardianship of her estate.  However, there was no evidence presented at the hearing that J.L.L. believed that anyone had stolen money from *her*, only that a relative had reported a theft.  Thus, this particular finding is clearly erroneous, although it has no bearing on our decision.

Separately, we disregard two sources of evidence on which J.L.L. relies because neither was introduced into evidence at the final hearing on guardianship and protective placement and there is no indication that the circuit court relied on either in reaching its determinations: a report submitted by Dr. Sandhya Shah that the County relied on in support of its petition for temporary guardianship and emergency protective placement and an inventory of J.L.L.'s property that J.L.L.'s guardian submitted to the court several months after the hearing and the court's decision.

¶27     In order for an individual to be protectively placed, a petitioner must prove, by clear and convincing evidence, that, as pertinent here: (1) "[t]he individual has a primary need for residential care and custody"; (2) "the individual … is an adult who has been determined to be incompetent by a circuit court"; (3) "[a]s a result of … degenerative brain disorder …, the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others"; and (4) the "disability … is permanent or likely to be permanent." WIS. STAT. § 55.08(1).

¶28     J.L.L. argues that the County did not prove by clear and convincing evidence that, as a result of a permanent degenerative brain disorder, J.L.L. is "so totally incapable of providing for … her own care or custody as to create a substantial risk of serious harm to herself or others." WIS. STAT. § 55.08(1)(c). "Care" as used in § 55.08(1)(c) means "that the person's incapacity to provide for his or her daily needs creates a substantial risk of serious harm to the person or others." *Jackson County v. Susan H.*, 2010 WI App 82, ¶17, 326 Wis. 2d 246, 785 N.W.2d 677. "Custody" as used in this provision means "that the person cannot provide for himself or herself the protection from abuse, financial exploitation, neglect, and self-neglect that the control and supervision by others can provide." *Id.* J.L.L. asserts, "At most, the evidence proved that [she] had physical health conditions that required temporary hospitalization or rehabilitation."

¶29     We conclude that clear and convincing evidence supports the circuit court's order for protective placement. This evidence includes the following. In his report, Freiburger stated that J.L.L. has an incapacity in the form of a degenerative brain disorder that is likely to be permanent and that renders her so incapable of providing for her own care and custody as to create a substantial risk

16

of serious harm to herself.[5]   The report further stated that J.L.L. has a primary need for residential care and custody in a secured setting with 24-hour supervision.

¶30   In support of these conclusions, Freiburger's report stated that "24-hour supervision and oversight is important" for J.L.L. because of her "inability to comprehend and plan for her needs" and her "history of refusing help and support." This includes J.L.L.'s belief that she was "just fine" in the motel room leading up to the hospitalization and placement.   It also includes her "noncompliance with treatments and medications critical for her health and safety," including her refusal to use the oxygen prescribed to her despite her "history of acute chronic respiratory failure with hypoxia," the "deep and infected" wound on her foot, and her significant pressure ulcer—all conditions that placed her in "severe danger." Freiburger also noted the information he had received from J.L.L.'s social worker that J.L.L. "continues to have issues with incontinence as she remains incontinent more than 50 [percent] of the days," and Fitch testified at the hearing that J.L.L. needed assistance with cleanup for each incident of incontinence to avoid infection.

¶31   In addition, Freiburger testified that, based on his in-person evaluation of J.L.L. that occurred two weeks before the final hearing, his opinion was that J.L.L. had a primary need for residential care and custody in a licensed, certified, or registered setting, because "there is a real resistance, reluctance, suspiciousness for her to allow for adequate help and supports" and that this was "in part, due to [J.L.L.'s] belief … that she does not have the conditions that she

_____

[5] "Incapacity" means "the inability of an individual effectively to receive and evaluate information or to make or communicate a decision with respect to the exercise of a right or power." WIS. STAT. § 54.01(15).

has, does not have the impairment and then, therefore, does not need the help and assistance that she needs." Freiburger testified that J.L.L. needed 24-hour supervision to attend to her medication needs, to monitor her for falls, and to attend to wound care. Freiburger also testified that, if J.L.L. were discharged from the skilled nursing facility, there was no identifiable place where she would be able to stay. He testified that J.L.L.'s insurance company has determined that they will no longer pay for stays outside of her house, and that J.L.L. could not return to her house given its condition.

¶32    J.L.L.'s need for protective placement was also supported by the testimony of the County's other two witnesses, which the circuit court credited. Fitch, J.L.L.'s occupational therapist, testified that it was her recommendation that J.L.L. remain at a skilled nursing facility. Fitch's opinion was based on the fact that J.L.L. was in need of standby assist for all toileting transfers, bathing, and hygiene because J.L.L. was not able to perform those tasks independently, and due to J.L.L.'s recurring incontinence. Theder, the lead adult protective service worker for the County, testified that she took J.L.L. into custody under WIS. STAT. ch. 55 after Theder was contacted by a hospital where J.L.L. was then a patient and was told by hospital staff that they deemed J.L.L. "incapacitated" and that J.L.L. was saying she was going to leave the hospital. Theder attempted to find out from J.L.L. and other sources whether J.L.L. had "family, friends or other supports," but was unable to locate any such support.

¶33    We conclude that, based on the totality of the record, the County proved by clear and convincing evidence that all of the standards for protective placement were met.

**CONCLUSION**

¶34    For the reasons stated, sufficient evidence supported the circuit court's orders for guardianship of J.L.L.'s person and estate, and for protective placement.  Accordingly, we affirm the court's orders.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.